IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Cr. No. 18-CR-03989-WJ |
| | ) | |
| vs. | ) | |
| | ) | |
| **ALLISTER DANZIG QUINTANA**, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' MOTION FOR UPWARD DEPARTURE OR IN THE
ALTERNATIVE VARIANCE, AND SENTENCING MEMORANDUM**

The United States respectfully submits this motion for upward departure or in the

alternative variance, and sentencing memorandum.  The United States hereby requests the Court

grant the upward departure or in the alternative variance, and sentence Defendant to

imprisonment for life, a $100 special penalty assessment, and restitution.

I.      **Facts**

In January of 2018, Defendant became angry with his cousin, John Doe, for failing to bail

him out of jail.  The animosity came to a head on the night of February 2, 2018, and resulted in

Defendant torturing and murdering Doe.  That evening, Defendant and several friends and family

members socialized at Defendant's house in Dulce, New Mexico.  After consuming alcohol,

Defendant attacked Doe.  The assault began in Defendant's living room.  Initially, Defendant

used his fists to punch Doe in the face.  (Doc. 60, ¶ 14).  Defendant's friend, Andrew Bettelyoun

joined in the assault.  *Id.*  Unsatisfied with the bare-knuckled assault, Defendant and Bettelyoun

acquired a fourteen-inch metal flashlight and lighter from a back room.  *Id.*  Defendant beat Doe

with the flashlight and burned him with the lighter.  *Id*.  Bleeding profusely, Doe was forced into

the bathroom to avoid staining the living room.  *Id*.  Defendant and Bettelyoun followed Doe into

the bathroom and began a new phase of the eventual murder.  *Id*.

Once the group entered the bathroom, Defendant directed Doe to undress.  *Id*.  Defendant

continued beating Doe with the metal flashlight.  *Id*.  Once undressed, Defendant directed Doe to

insert the flashlight into his rectum.  *Id*.  Humiliated, Doe complied.  *Id*.  Defendant picked up

the flashlight with a towel and continued beating Doe.  *Id*.  As he beat Doe, Defendant told

Bettelyoun to retrieve an extension cord from another room.  *Id*, ¶ 15.  Bettelyoun brought him

the cord and Defendant tied Doe's hands behind his back.  *Id*.  Beaten and humiliated, Doe did

not even resist.  *Id*.

After binding Doe, Defendant used a machete to chop his back.  *Id*.  Doe was bleeding

from multiple wounds, so Defendant instructed Bettelyoun to put wrapping paper on the floor of

a nearby closet.  *Id*., ¶ 16.  The two moved Doe from the bathroom to the closet.  *Id*.  Doe begged

for his life.  *Id*.  Defendant and Bettelyoun left Doe in a closet where he eventually perished.

Nearly two weeks later, a relative of the Defendant discovered Doe's body when

investigating a rank odor.  Defendant had been in tribal jail for more than a week on unrelated

charges while Doe's body remained in the closet.  Defendant's relative contacted law

enforcement and first responders arrived on scene.  Doe's sister, a volunteer first responder,

arrived at Defendant's house.  As she assessed the scene, she inadvertently observed Doe's

condition.  The deterioration to Doe was so severe, she did not even recognize him.  Tribal law

enforcement and the FBI arrived on scene and initiated a murder investigation.  They located

bloody weapons around the house.  They took Doe's remains to the Office of the Medical

Investigator.

The Office of the Medical Investigator (OMI) was unable to pinpoint a cause of death, noting it was homicide "by unspecified means."  OMI explained that Doe had a multitude of injuries but could have died from asphyxiation, dehydration, or even starvation.  They noted Doe suffered from skull fractures, strangulation, rib fractures, bruising and major lacerations including "gaping" incisions on his back and foot.

On May 24, 2018, Defendant was charged by complaint with murder.  (Doc. 1).  After several waivers of time, a federal grand jury indicted Defendant for first-degree murder in Indian Country on December 4, 2018.  (Doc. 26).  On February 13, 2019, the grand jury added the charges of kidnapping resulting in death and conspiracy to commit kidnapping in a superseding indictment.  (Doc. 37).  On January 22, 2020, Defendant pleaded guilty to second-degree murder. (Doc. 57).  As part of the plea agreement, the parties agreed to lift the *Booker* bar.  *Id*., ¶ 10.

On March 16, 2020, the USPO submitted a PSR to the Court.  (Doc. 60).  The USPO calculated Defendant's guidelines range as 210 to 262 months of imprisonment.  *Id*., ¶ 80.  The USPO advised that an upward departure for extreme conduct may be warranted in this case.  *Id*., ¶ 95.  The United States hereby moves this court to impose an upward departure of six levels for the unusually heinous, cruel, brutal, and degrading conduct of the Defendant.  *See* U.S.S.G. § 5K2.8.  In the alternative, the United States asserts that full consideration of the sentencing factors warrants an upward variance to imprisonment for life.

## II.    Motion for Upward Departure

A court may apply an upward departure for conduct that is "unusually heinous, cruel, brutal, or degrading to the victim."  U.S.S.G. § 5K2.8.  Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation.  *Id*.  It is unnecessary for a departing court to first establish "typical perpetrator offense conduct" before applying § 5K2.8.  *United States v. Begaye*, 635 F.3d 456, 469 (10th Cir. 2011).  Rather, the

3

conduct must only be deemed to exceed routine perpetration of the crime. *Id*. The degree of departure must only be supported by "any reasonable methodology hitched to the Sentencing Guidelines." *United States v. Checora*, 175 F.3d 782, 795 (10th Cir. 1999).

In *Checora*, the Tenth Circuit upheld an upward departure for extreme conduct. *Id.* at 782.[1] There, the murderers beat the victim during a fight, used a knife on him multiple times, and hid the body in an abandoned house. *Id*. at 786. The assault occurred in three phases, lasting about an hour. *Id*. at 792. The autopsy determined that the victim suffered "three types of trauma—blunt, sharp, and compressional—and that these injuries, *separately* or in combination, could have resulted in [the victim's] death." *Id*. at 793. The multitude of injuries indicated that the force used was beyond that merely designed to kill a victim. *Id*. The conduct at issue was distinct from the heartland of killings that occur due to "one continuous and brief instance" of violence. *Id*. Due to the extended period of pain and torture the victim was forced to endure, consciously or not, the upward departure was warranted. *Id*. at 792. The Tenth Circuit later explained that extreme conduct warranting a § 5K2.8 departure could be perpetrated on an unconscious, or even dead victim. *United States v. Hanson*, 264 F.3d 988, 999 (10th Cir. 2001).

Similarly, in *United States v. Kelly,* 1 F.3d 1137 (10th Cir. 1993), the Tenth Circuit upheld the imposition of an upward departure for extreme conduct relating to a second-degree murder conviction. There, the murderer choked the victim, used a tire iron and jack on him, and disposed of his body in a pond. *Id*. A doctor testified that the victim died from "a combination

---

[1] While upholding the application of an upward departure under section 5K2.8, the *Checora* Court remanded the case to the district court to determine the appropriate extent of departure. Upon remand, the district court determined six offense levels was appropriate, based off of the six-level offense enhancement for "permanent or life-threatening injury" under the assault, robbery, and extortion guidelines. *United States v. Checora*, 79 F. Supp. 2d 1322, 1324 (D. Utah 2000). There was no subsequent appeal.

of blunt and sharp force injuries of the head and neck." *Id*. at 1144.  The Court found that these were aggravating circumstances not contemplated by the second degree murder guidelines.  *Id*. at 1143.  The injuries inflicted by Kelly were gratuitous because they were "unnecessary or unwarranted."  *Id*. at 1144.  The Court reasoned the injuries were "beyond what is necessary to effectuate the death of the victim."  *Id*.  Kelly "inflicted cumulative damage beyond the threshold necessary to kill the victim."  *Id*.  Despite upholding the imposition of the extreme conduct departure, the Kelly Court remanded with instructions to the trial court to explain its methodology on the degree of departure.  *Id*.

Defendant's conduct was unusually heinous, cruel, brutal, and degrading to the victim, warranting the imposition of a six-level upward departure pursuant to U.S.S.G. § 5K2.8.  This level of departure, identical to *Checora*, would result in an offense level of 43.  Coupled with a criminal history category of I, Defendant's adjusted guidelines range would be imprisonment for life.  U.S.S.G. § 5A.  This level of departure would reflect Defendant's extreme conduct and is supported by analogous Tenth Circuit precedent.

Similar to *Checora* and *Kelly*, Defendant's conduct greatly exceeded that which would have been necessary to accomplish the murder of Doe and was not contemplated by the standard second-degree murder guidelines.  Defendant tortured Doe with several instruments in three separate phases.  He beat him with a flashlight, burned him with a lighter, cut him with a machete, and bound him with a cord.  Doe suffered three types of trauma, blunt, sharp, and compressional.  Even more outrageous, Defendant forced Doe to degrade himself by forcing him to undress and insert the flashlight into his rectum.  The torture occurred in three rooms for what would necessarily have been prolonged duration.  Finally, Defendant eventually left Doe in the closet where he may have painfully surrendered to starvation, asphyxiation, or dehydration.

5

Even Defendant's treatment of Doe's remains was exceptionally cruel.  He left Doe's body in a

heated home for several weeks while he served a jail term.  The deterioration of the body was so

severe that he robbed Doe's family of standard grieving practices.  The exposure of Doe's

deteriorated remains to Doe's sister amplified the cruelty.

The Court should depart upward six levels.  In determining what level to depart, a court

may use "an analogy to other closely related conduct or circumstances that are addressed by the

guidelines."  *United States v. Jackson*, 921 F.2d 985, 990-91 (10th Cir. 1990).  On remand in

*Checora*, the district court did just that, justifying its six-level upward departure based on

analogous enhancements in the Guidelines.  *Checora*, 79 F. Supp. 2d at 1324.  The district court

found that six levels was appropriate because the defendants were responsible for "torturing the

victim, prolonging the pain involved, and gratuitously inflicting serious injury."  *Id*.  It noted

that, under the guidelines for several similar offenses, permanent or life-threatening injury is

enhanced by at least six points.  *Id.*  (citing U.S.S.G. §§ 2A2.2(b)(3)(C), 2B3.1(b)(3)(C), and

2B3.2(b)(4)(C)).  Therefore, it concluded that the defendant's guidelines should be enhanced by

a similar offense level to recognize the multiple different serious injuries inflicted upon the

victim.  *Checora*, 79 F. Supp. 2d at 1324.  The fact that the victim eventually died did not

diminish the fact that the defendants tortured him in several ways, each independently rising to

the level of permanent or life-threatening injury.  *Id*.  Therefore, a six-level upward departure

commensurate with analogous guidelines was appropriate.  *Id*.  The findings were not appealed.

*See also United States v. Ankerpont*, 145 F.3d 1346 (10th Cir. 1998) (unpublished) (affirming a

district court's similar justification for a six-level upward departure for extreme conduct).

Here, the district court should do the same thing and apply a six-level enhancement by

analogizing the conduct to permanent or life-threatening injury.

### III.     Analysis Under 18 U.S.C. § 3553(a)

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a

sentence that is sufficient but not greater than necessary to achieve the statutory purposes of

federal sentencing.  *United States v. Booker*, 543 U.S. 220 (2005).  While a sentence within the

guidelines is presumptively reasonable, a court may vary after consideration of all of the

sentencing factors.  *Gall v. United States*, 552 U.S. 38, 49 (2007).

As discussed above, a six-level upward departure is warranted in this matter.  However,

in the alternative, the Court can and should vary upward to life imprisonment.  Full consideration

of the sentencing factors supports an imposition of a sentence well above the guidelines range.

While several factors weigh neutrally, the nature and circumstances of the offenses, defendant's

history and characteristics, need for adequate deterrence, the applicable sentencing guidelines,

and the need to avoid disparities support an imposition of a guidelines sentence.

### A.  The Nature and Circumstances of the Offenses and the Defendant's History and Characteristics

A court must consider "the nature and circumstances of the offense and the history and

characteristics of the defendant."  § 3553(a)(1).  This analysis "is aimed at distinguishing among

defendants who commit a particular offense or type of offense."  *United States v. Irey*, 612 F.3d

1160, 1202 (11th Cir. 2010).  In distinguishing, a court may take into account brutality.  *United*

*States v. Jim*, 347 F. Supp. 3d 847, 867 (D.N.M. 2018).

The nature and circumstances of the offense supports imprisonment for life.  This is

firmly outside of the heartland of murder cases.  Defendant did not just kill a man, he humiliated

him, he tortured him, and he left him to die in a closet.  The heartland of second-degree murder

cases does not contemplate torture.  Furthermore, the torture was particularly brutal, utilizing

different instruments to inflict pain in three phases.  Finally, Defendant's brutality was not

limited to Doe.  His treatment of Doe's remains amplified the impact of the crime on Doe's

family.  Particularly, Doe's sister suffered major psychological trauma when she was

inadvertently exposed to the body's condition.

Defendant's criminal history is similarly abysmal and warrants an upward variance.

(Doc. 60, ¶¶ 36-47).  In less than ten years, Defendant has been charged nine times.  *Id*.  While

none of his previous conduct was even close to the brutality involved in this case, several times

his convictions were for violent crimes.  *Id*., ¶¶ 38-42.  At least five of the crimes appeared to

victimize women, and at least one involved confinement of the victim in his home.  *Id*.  Despite

indicia that Defendant is a violent person who preys on the vulnerable, he did not receive a single

criminal history point for his criminal history.  *Id*., ¶ 43.

## B.  <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Adequate Deterrence and to Protect the Public from Further Crimes of the Defendant</u>

A variance above the guidelines range is necessary to reflect the seriousness of the

offense and provide adequate deterrence.  Deterrence includes both general deterrence and

specific deterrence.  *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).  While

general deterrence's goal is to "deter others from committing the same crime by demonstrating

its disadvantageous consequences," specific deterrence's goal is "to incapacitate the wrongdoer,

so as to protect society from further criminal activity."  *Irey*, 612 F.3d at 1227.  An overly lenient

sentence "signals to others that it is not a big deal to repeatedly defy United States' laws."

*United States v. Corchado-Aguirre,* 629 Fed.Appx. 837, 840 (10th Cir. 2015).

A life sentence reflects the seriousness of Defendant's conduct.  In general, second-

degree murder is one of the most serious federal crimes.  Congress clearly indicated the severity

of the crime by making the maximum penalty imprisonment for life.  18 U.S.C. § 1111(b).

Defendant's conduct reflected a mens rea that greatly exceeded the mere "malice aforethought" required by second-degree murder.  Rather, Defendant wanted to make Doe suffer before killing him.  He did this by inflicting pain, humiliation, and eventually subjecting Doe's family to his condition.  A sentence within the guidelines would not adequately reflect the seriousness of this type of sadistic behavior and would signal to the community that a brutal torture is no different from an isolated shooting.  But there is a difference ― a huge difference.  Doe's death was not quick and painless.  He died after being beaten, tied up, and sodomized.  Finally, as a specific deterrent, Defendant will be incapacitated from committing this type of crime against his community for the duration of his prison sentence.

### C.  The Sentencing Guidelines for the Applicable Category of Offense Committed by the Applicable Category of Defendant

The Court must consider under 18 U.S.C. § 3553(a)(4) the sentencing range established by the United States Sentencing Commission for the applicable category of offense committed by the applicable category of defendant.  The Supreme Court has recognized that even in the post-*Booker* world "the [Sentencing] Commission fills an important institutional role:  It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise . . .'"  *Kimbrough v. United States*, 552 U.S. 85, 109 (2007).  "In the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve 3553(a)'s objectives.'"  *Id*. at 89.  While a sentence within the guidelines is presumptively reasonable, a court may vary after consideration of all of the sentencing factors.  *Gall*, 552 U.S. at 49.

As discussed above, a six-level upward departure for extreme conduct is warranted in this matter.  Should the Court impose the upward departure, the United States' requested sentence is squarely within the guidelines range.  However, if the Court chooses not to depart, full

consideration of all of the sentencing factors should lead it to vary upwards in the alternative. This is precisely the type of case which exceeds the "ordinary case" contemplated by the guidelines. Defendant's heinous conduct distinguishes this case from the heartland of second-degree murder cases. To sentence Defendant to a term of imprisonment commensurate with a standard murder by firearm would greatly diminish the severity of his conduct. Therefore, an upward variance to reflect the unique and horrible conduct involved in this murder is appropriate.

### D.  The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records who have Been Found Guilty of Similar Conduct

The court must consider the need to avoid unwarranted sentence disparities among defendants situated similarly. 18 U.S.C. § 3553(a)(6). A sentence within the statutory limit accounting for the guideline range is the best approach to preventing unwarranted sentencing disparities between similarly-situated defendants. The values of the justice system are undermined when there is substantial variance in sentences for similar offenses between judicial districts and even between individual judges in a single district. This factor is designed to avoid nationwide disparities in sentencing. *United States v. Garza*, 1 F.3d 1098, 1100 (10th Cir. 1993). A variance based exclusively on a disparity between codefendants is improper. *United States v. Gallegos*, 129 F.3d 1140, 1144 (10th Cir. 1997).

Although the Court may not base a variance exclusively on a disparity between Defendant and his codefendant, the requested upward variance would rectify a sentencing anomaly between the two. By all accounts, Defendant's conduct was far more egregious than his codefendant, Mr. Bettelyoun's conduct. However, based upon the application of a cross-reference in Mr. Bettelyoun's case, his applicable guidelines range is imprisonment for 360 months to life. This is a glaring disparity between the codefendants considering that Defendant

and Mr. Bettelyoun have similar criminal histories.  While the Court cannot base an upward

variance exclusively on this disparity, Mr. Bettelyoun is one of Defendant's nationwide

contemporaries.  Therefore, an upward variance based upon the other § 3553(a) factors would

avoid a disparity with at least one nationwide contemporary and would rectify an unfair

anomaly.

### IV.    Conclusion

WHEREFORE, the United States hereby requests the Court grant its motion for a six-

level upward departure or in the alternative vary upward to imprisonment for life, and impose a

$100 special penalty assessment and restitution.

Respectfully submitted,

JOHN C. ANDERSON
United States Attorney

*Electronically filed on April 2, 2020*

JOSEPH M. SPINDLE
FREDERICK MENDENHALL
Assistant United States Attorneys
201 Third St. NW, Suite 900
Albuquerque, NM 87102
(505) 346-7274 telephone
(505) 346-7296 fax

I HEREBY CERTIFY that I filed the foregoing
pleading electronically through the CM/ECF system
which caused counsel of record to be served by
electronic means, as reflected on the Notice
of Electronic Filing, and other methods of service as
indicated therein on April 2, 2020.

___/s/_____
JOSEPH M. SPINDLE
Assistant United States Attorney

11