Joseph Spindle

RECEIVED
JUL 03 2018
U.S. ATTORNEY'S OFFICE
Albuquerque, NM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

IN RE: ALLISTER QUINTANA

BEAN & ASSOC'S, INC.
GRAND JURY MATERIAL

TRANSCRIPT OF PROCEEDINGS
Matter 15
June 13, 2018
10:38 a.m.
Testimony of Benny Collins, Aileen Kutch, Matthew Martines, Harley Howland & Jenessa Vigil

BEFORE: The Federal Grand Jury
Albuquerque, New Mexico

A P P E A R A N C E S

For the United States of America:

MR. JOSEPH SPINDLE
Assistant U.S. Attorney
District of New Mexico
201 Third Street, Northwest, Suite 900
Albuquerque, New Mexico 87102

(610N-AM)

[redacted]

[redacted]

[redacted]

MR. COLLINS: You guys are a lot of people.

BENNY COLLINS,

after having been first duly sworn under oath,

was questioned and testified as follows:

EXAMINATION

BY MR. SPINDLE:

Q. Good morning, Benny. How are you?

A. I'm good.

Q. Benny, did you get a subpoena to be here today?

A. Yes, I did.

Q. And you understand you are currently not the target of this investigation?

A. Yes, sir.

Q. Do you understand that there are currently no claims that you did anything wrong?

A. Yes, sir.

Q. And do you understand you are currently under oath?

A. Yes.

Q. And you understand you must tell the truth?

GOVERNMENT EXHIBIT
1
PENGAD 800-631-6989

A. Yup.

Q. Do you understand that if you do not tell the truth to the Grand Jury, you may be charged and convicted of perjury, obstruction of justice, entering false statements, each of which is punishable by up to five years in prison?

A. Yes, sir.

Q. Do you understand that you may refuse to answer any questions that would incriminate you?

A. Yes, sir.

Q. Benny, do you know somebody by the name of Allister Quintana?

A. Yes, I do. He's one of my best friends.

Q. How long have you known Allister?

A. I met him when I was, like, ten, maybe nine -- when we were kids.

Q. And do you know if Allister has an Instagram account?

A. He has an Instagram, yeah, that he talked to his girl friend with. He conversed with her over it.

Q. Is his name on Instagram Danzig Crowley?

A. Personally, I can't have Instagram cuz my girl's insecure, so I wouldn't know.

Q. You're not sure what his Instagram account

is?

A. I wouldn't know.

Q. Do you know that his middle name is Danzig?

A. Allister Danzig Crowley?

Q. No, I'm sorry; Allister Danzig Quintana?

A. Yeah.

Q. Does he go by "Crowley" sometimes?

A. He calls himself Crowley. It's a pretty evil name his dad gave him. It's pretty awful.

Q. Related to Aleister Crowley, the infamous satanist from the early 20th Century?

A. Yes.

Q. Benny were you arrested in Dulce on January 22nd of 2018?

A. Yes, I was.

Q. Around that time period was Allister in jail, as well?

A. Yes, he was in there when I got in. I got thrown in for domestic violence.

Q. You were released from jail on January 31st of 2018?

A. Yes.

Q. And you bailed Allister out the next day, which would February 1st, of 2018.

A. My friend, Howard, bailed me out, and then

the next day I bailed him out.

Q. When you say "him" you mean "Allister".

A. Yes.

Q. You went to Allister's house that day you bailed him out?

A. Yeah, with Cheryl.

Q. And on February 1st of 2018, was there anything unusual about his house?

A. Just bottles -- like, alcohol bottles, trash bags. That's it.

Q. Did you notice --

A. -- from previous parties he had.

Q. Did you notice any unusual smells, or blood or anything like that?

A. No. There was nothing the day I was there.

Q. On February 1st of 2018.

A. Yeah.

Q. Did Allister want you to drink with him that night?

A. He wanted to drink with him, but I was supposed to go see my baby's mamma, my daughter. Went to go see her, and then my other -- my girlfriend, the one I got a DV with -- I wasn't supposed to be with her. I wasn't supposed to see her. I was under court order, and I still went to

see her. She stayed at my house. We weren't supposed to be together, but we hid behind the law, and she stayed at my house, and everyday since we've been at my mom and dad's.

Q. So you didn't stay at Allister's very late on the night of February 1st?

A. I'd say it was about 11:30 to 12:00 by the time I left.

Q. P.M.?

A. Yeah. My girl was kind of intoxicated. She was, like, Come pick me up. And I picked her up and went home.

Q. On the night of February 1st, did you notice anything unusual in Allister's house?

A. No. They were just drinking, him and Cheryl.

Q. Now, Allister's birthday is around the beginning of February, right?

A. Yes.

Q. Now, on Allister's birthday did he get in a fight with somebody named Travis Howland?

A. The only reason why I knew he got in a fight was because the day I seen Warren and them, they picked me up -- they showed pictures of him all bloody.

9

Q. And would that be Travis Howland?
A. Yes.
Q. Who is Travis Howland?
A. Robin Benidict's stepson, I think.
Q. He is a guy that lives in Dulce, as well?
A. I never knew the guy personally, but he was Allister's cousin. Supposedly stems from a debt of cards. Allister was supposed to get bailed out. He was sitting in jail since Christmas, or whatever. And then his deck of cards was getting shuffled between people. It ended up with Travis. Travis was supposed to bail him out, and never did.
Q. You bailed him out?
A. When I was in jail, I remember Allister talking about, "Yeah" -- Allister and Howard were, like, "Yeah, Benny, when you get out, you should go beat him up or something."
And I said, "You know what, I'm not going to do that."
And Allister straight up said, "You know what, I can handle it in my own hands."
Q. Allister said that he could handle Travis in his own hands?
A. That's when I put two and two together and figured out that he did it.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

U.S. v. Allister Quintana
4473

10

Q. That is before you bailed him out on February 1st?
A. Yeah, that's when we were in jail.
Q. On February 2nd of 2018, you picked up Allister and a guy by the name of Andrew Bedwin?
A. In my Ford truck, in Pagosa Springs.
Q. You picked him up in Pagosa Springs?
A. About 6:00 that he wanted me to go up. He said he was stranded. It was him, Cheryl, Aleen and Andrew. I told him I would pick him up. I left about 6:30, 7:00. Got up there. My truck goes very slow, so I got up there, picked him up.
And before I got there, Cheryl was, like, can you pick me up -- me and Aleen. And my girlfriend got on the phone right away and texted back, "We're not a damn taxi. We're not going to pick you up." My girl is insecure, you know.
Q. So she didn't want you to pick up the two women?
A. Not the two women. No, I was just there to pick up Allister and Andrew that same night, and dropped them off at his house in Dulce about 11:30 to 12:00, we dropped them off.
Q. P.m.?
A. Yeah.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

U.S. v. Allister Quintana
4474

11

Q. Did they both ride in the back of you truck from Pagosa?
A. Yeah. It was cold, but they were in the back.
Q. Did they both seem like they had had any alcohol that day?
A. They were all drinking. That's the reason why they were up there. He was calling on the phone saying, I'm at this bar and this bar, and they got stranded. Their ride broke down. And the same night, me and my girlfriend went to Walmart before it closes, and they bought, like, a 30-pack of Heineken. They only sell 3.2 in Colorado, but we still bought alcohol that night.
Q. But you left around 11:30 from Allister's house, when you dropped them off?
A. We pulled in, dropped them off, and me and my girl went back home and went to bed.
Q. On the night of February 2nd, after you dropped him off, did you go inside Allister's house for any reason.
A. No.
Q. After February 2nd, 2018, did you go inside Allister's house ever?
A. No. The only thing -- I tried going in,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

U.S. v. Allister Quintana
4475

12

but he wouldn't let me in.
Q. When was that?
A. Around the 3rd to the 5th. Andrew wanted to go get pills for his broken collarbone, so I went up and tried knocking on the door for about 30 minutes. No one wanted to let me in.
Q. Could you hear people inside?
A. I couldn't hear people, but I knew they were there from the texts and the calls. I went home and called him. I told him. "Why didn't you let me in, Bro? You wanted me to take Andrew to the hospital to get pills, you know."
And he just said he wasn't home.
I said, "I know you were home, Bro."
Q. This is between February 3rd and February 5th?
A. Yes.
Q. Was that unusual that he wouldn't let you in after texting you to come?
A. Just like I told the FBI, if he came over to my house, and he wanted me to do something for him, or he came to my house, I would let him in and give him something to drink -- give him a soda.
Q. Did you notice there was broken pottery outside the house?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

U.S. v. Allister Quintana
4476

A. Yeah. The day I pulled up I kind of, like, pulled in. It was there. I didn't want to run it over, so I moved it to the side, pulled up and knocked on the door. That was the same day.
Q. And his front window was broken out?
A. It has been broken. The day I got out of jail, I went to his house to get a guitar, and it was broken.
Q. And so it has been broken since 2017.
A. It's been broken even probably before that.
Q. Did you knock on the door and try to get their attention when you were out in front of their house?
A. Yes. I knocked -- I honked, knocked for about 30 minutes. They didn't want to come out.
Q. Do you know who was hanging out with Allister that day?
A. Yeah, it was Allister, Leeshy -- her name is Alicia Vigil and Andrew Bedwin.
Q. How do you know that they were hanging out with Allister?
A. Because I knew Leeshy was there, because a couple days before that he wanted me to take her home. And I'm not allowed to be around girls, you know, so that was out of the question. And I knew

Andrew was there because he called on the phone, wanted me to take him to get pills. So they were the only ones eating there, sleeping there, just congregating there, you know.
Q. Now, this day between the 3rd and 5th of February, Andrew had a broken collar bone, you said?
A. Yes.
Q. Did he have that broken collar bone on the 2nd of February when you picked him up in Pagosa?
A. Yeah, he did.
Q. He did? Did you see it?
A. They were riding around when I took them to the Walmart. They were kind of funny people -- they were riding around inside -- he was pushing him in the wheelchair. They were, like, putting on hats and stuff, acting all funny. And they bought Heineken that night.
Q. Was he wearing a sling or anything at that time?
A. Uh-huh, I'm pretty sure he was.
Q. On 2nd of February?
A. Yeah.
Q. Now, was Allister rearrested on February 8th of 2018, for intoxication?
A. Yeah. He called me that same night, and I

just told him, "Be safe," you know. I told him, "Don't end up in jail again. I didn't bail you out for nothing." And sure enough, he was back in jail.
Q. So he was out of custody from February 1st to February 8 of 2018?
A. From his birthday to the 8th, I'm pretty sure. That's when they were up -- I don't know what street it was, but they were up there drinking. Him and Leeshy were in the room, and that's how I knew they were together, too, because he was sleeping with her in the room. They kicked open the door and arrested them.
Q. Were they in a relationship Leeshy and Allister.
A. They were in a relationship for a while previously. It was, like, off and on. It is like hit and miss, arguing all the time.
Q. And then on February 14th of 2018, you spoke with somebody named Brian Cachucha about what he found at Allister's house, right?
A. Yeah.
Q. What did he find at Allister's house?
A. He came to my house and he said that he found a body. He told me and my dad. And then immediately after that I started getting calls,

getting harassed by the people in town -- by the victim's family and stuff. And I told him, pick me up right away. Take me straight to the FBI, you know.
Q. So did you speak with Travis Howland's sister that evening?
A. Yes. I seen her in person.
Q. Her name is Harley Howland?
A. Yes.
Q. And did she give you a ride to speak with law enforcement?
A. Yeah, she took me up to the scene where the FBI was, and they told me to meet at 6:00 at the PD. So that's what I did.
Q. And why did you decide to cooperate so fully that day?
A. Because -- I don't know -- just the family needs it, you know. They need closure. It was all over Facebook. They were saying he was missing or something. So I just felt it was my obligation. I had nothing, you know.
Q. Have you given several other statements to the FBI?
A. Yeah, I talked to them, like, three times. I also did a wiretap thing. They made me wear a

beanie and stuff when I visited with him.
Q. In jail?
A. Yeah.
Q. And you spoke with him with a recording device?
A. They made me put it around my ear, and run it through my back. And I had, like a headphone with a mic in it, and I spoke to him several times.
Q. And during all of your interactions with law enforcement in this case, the FBI, as well as tribal police, you understood how important it was to tell the truth, right?
A. Yes, sir.
Q. And were you honest with them every time?
A. Yes, sir.
Q. Did you tell them everything you know?
A. Uh-huh.
Q. And you provided shoe impressions and tire impressions for the shoes that you were wearing --
A. Same shoes I'm wearing now, my Vans. And they took my tire tracks, and my make and model, everything.
Q. And at the time you spoke with the FBI, you actually had Allister's debit card in your possession, right?

A. Yes.
Q. And did you turn it over to the FBI?
A. Uh-huh, yup.
Q. Why did you have Allister's debit card in your possession?
A. The day he got out, he wanted to put his debit card somewhere. He don't have a P.O. box, so he wired it to my dad's P.O. Box.
Q. When you say "wired it," did he mail it, the physical card?
A. Yes.
Q. And was there any cash that he had associated with that debit card?
A. He has a trust fund. The Nation gives their children -- the members, trust funds. So he had a pretty good amount of money.
Q. And was there $300 cash that you had in your possession that Allister's at the time you went to visit the FBI?
A. Yeah, the reason why I did that is because when I bailed him out I pawned my Xbox. It was an old Xbox -- my old Xbox, my old games, my new Play Station, all of my new games. So that's the reason why. I kept 200. I gave them 100, and his debit card. The 200 was for what he owed me for me bailing

him out the first time and then skipping on it.
Q. So you kept the 200 that he owed you, and provided the other 100 to the FBI?
A. Yes.
Q. The day before you heard about the body being discovered in Allister's house, you spoke with him in jail, right?
A. Yeah the day I spoke with him in jail, he was just very frantic, saying that he wanted to get out, he wanted to clean his house. He wanted to skip town, get excluded from the rez, get, like -- it's called a "floater," I guess. Just get off, you know, get away. That's very unusual for him, you know, especially, with his amount of money, and the way he drinks at home. It's kind of unusual for him to leave, skip town.
Q. Did he tell you he did something bad and went overboard?
A. Yeah, when he was in jail.
Q. He told you, when he was in jail, that he had done something bad?
A. No, when he was in jail on the 14th, when I went to visit him. I just told him, you know, I don't want to hear about it. I only want to hear about the good things.

Q. You said the 14th, but it was certainly the day before --
A. It was Valentine's, because I told him, "I'm not going to bail you out today, Bro. It's Valentine's Day. It's for me and my girl. It's not for you, Bro. I'm sorry. I told him, "I'll get you out tomorrow."
The day I went in, the 15th, I tried to get him out, and Peter Dock denied me, said that he skipped his last bail, and he said that the tribe hasn't been paying him back.
Q. Is that a bondsman?
A. Yeah, he denied.
Q. So you tried to post his bond on the 15th?
A. On the 15th. Same day I went back home, and that's when Brian came over to the house, that evening.
Q. So the night that Brian came over to the house is the night you tried bail --
A. Yeah, the 15th.
Q. So you already knew the body was discovered when you tried to bail out Allister?
A. No.
Q. It was before that?



A. It was after.

Q. I'm sorry, can you explain that again?

A. Because I went to go bail him out, and then --

Q. The bondsman wouldn't let you?

A. And then I got home, it was like maybe 3:00, 4:00, and that's when Brian came over, and that's when Howard and Harley and all them started accusing me, so I told them to pick me up.

Q. And it was the day before that that you spoke with Allister in jail?

A. Yeah, and he was just very frantic trying to get out of town, trying to leave.

Q. And, Mr. Collins, you never went inside Allister's house on the 3rd of February?

A. No.

Q. You never saw a dead body in a closet on the 3rd of February?

A. No, sir.

[redacted]

THE WITNESS: I've never been in a thing with all kinds of people like this. It's a lot of people.

[redacted]

THE WITNESS: Thank you guys.

[redacted]

AILEEN KUTCH,

after having been first duly sworn under oath, was questioned and testified as follows:

EXAMINATION

BY MR. SPINDLE:

Q. Good morning.

A. Morning.

Q. Would you please introduce yourself to the Grand Jury?

A. Hello everyone. My name is Aileen Kutch.

Q. Ms. Kutch, did you get a subpoena to be here today?

A. Yes, I did.

Q. You understand you are not the target of this investigation?

A. Yes.

Q. And do you understand there are currently no claims that you did anything wrong?

A. Yes.

Q. Do you understand you are currently under oath?

A. Yes.

Q. Do you understand you must tell the truth?

A. Yes.

Q. Do you understand, if you do not tell the truth to the Grand Jury, you may be charged with perjury, obstruction of justice, an/or false statements, each of which is punishable by up to five years in prisonment?

A. Yes.

Q. Do you understand that you may refuse to answer any questions that would incriminate you?

A. Yes.

Q. Ms. Kutch, can you tell me how you know or knew Travis Howland?

A. I've known him since I was 17. We both attended boarding school in Oklahoma. And we were friends until 19, and then we got together. And so I've known Travis for about 12 years.

Q. When you say "got together," were you in an intimate relation with Travis?

A. Yes. I have a baby from him.

Q. How long were you guys together?

A. Seven years, and then off and on for two or three years.

Q. Did something terrible happen to Travis in

February?

A. Yes.

Q. Can you tell the Grand Jury what you know?

A. Like, the whole story?

Q. No, just tell them about when you discovered what happened to Travis?

A. February 2nd -- I believe, I think, is when he was murdered. I tried looking for him afterwards, like a few days. And it was then when I had the terrible feeling that something bad happened to him, because I couldn't find him anywhere. So I believe that something happened to him on February 2nd.

Q. And when did you find out he was killed?

A. On Valentine's.

Q. February 14th of 2018?

A. Uh-huh.

Q. I'm sorry, ma'am. There is some tissue right in front of you, if you need one. And we can take our time, okay.

Was the last time that you saw Travis February 2nd of 2018?

A. Yes.

Q. Tell the Grand Jury what you did that day?

A. That morning he had gotten in contact with me on Messenger. He was staying with his cousin,

25

Isaiah. Isaiah had went to work, and he went to the tribal building with Isaiah, and said he was going to wait there for me. I was getting our daughter ready for school. We were supposed to go up to Pagosa Springs to get me a new headlight, because I had no headlights, and he just got a loan.

So we -- he wanted to take our daughter to school that day instead of me just dropping her off. He wanted to see her get dropped off at school, too. So we both went up there, dropped her off, and we jetted straight up to Pagosa. Did my headlights first, and then went to Walmart and he got things for our daughter, Valentine's stuff, and got her clothes and whatever I needed, and what he needed. He got, like, a bunch of things.

That's why I knew something was wrong, because he would have wanted those things -- shoes, underwear, shampoo, lotion, like, whatever. He needed those things. Those things were necessary. So that day we had to come back before 2:00, because that's when our daughter gets out of school -- out of Headstart, so I told him we needed to be back by 2:00.

So we came back, probably around 1:30, almost 2:00, I want to say. I dropped him off first

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

U.S. v. Allister Quintana

4489

26

at his friend Matt's -- Matthew Vincente. And that was the last I saw him that day. I told him I would be back, or not to go anywhere, that we were trying to bond out Cheryl's boyfriend, the other Matt, and we had to go see the bondsman in Pagosa.

Q. When you say "the other Matt," you are referring to Allister Quintana?

A. No, Matthew, because he was in jail at the time. And so Cheryl had asked Allister if he could help bond out Matthew, because he was in there. So he agreed, and I thought that they had already called to double-check and see if they could get him out, but they didn't. So when we went out there they said they couldn't -- some reason he couldn't get bonded out. So, it was Allister's birthday, and he was kind of being somehow, like, with an attitude. It's my birthday and nobody wants to do anything. I, at least, want to go eat. So I felt bad, and I took him to go eat. He had his own money and everything. But he didn't get his full trust fund, or something like that. So he had some cash, though, and that's what he paid for the food.

It was getting evening. The sun was going down, and I kept telling him, I need to get back to Travis. I need to go back to Travis before it gets

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

U.S. v. Allister Quintana

4490

27

too dark. And every time I would say Travis' name, he would just role his eyes, or not pay attention to me, and that was weird for me. I was just, like, Oh my gosh.

So we were waiting and waiting, and it got too late -- and we were waiting for Allister. He just sat in the restaurant that whole time. I don't know what he was doing. Me and Cheryl were waiting outside, and it got too dark, so we went to the hotel -- waiting for those guys. We told them we would wait for them there.

When we got there Allister was frustrated, because he said he couldn't get into his trust fund account, or something like that. So we walked to Walmart -- me and Cheryl walked to Walmart from the hotel room. We were still waiting for Allister and Andrew. We got there first and we were waiting, and we were calling around to see if we could get a ride back down to Dulce. But nothing.

And the only one that responded back to Cheryl was Benny, and he said, Yeah, he would, but then I guess his girlfriend seen the phone, and she doesn't get along with Cheryl for whatever reason, So she said no. She wouldn't let him pick up Cheryl, for whatever reason. So she said, "No," but they

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

U.S. v. Allister Quintana

4491

28

were going to pick up Allister and Andrew and take them back. And it is just a single cab -- an old truck. So they got into the back of the bed. And me and Cheryl couldn't get ahold of anybody -- nobody. So we walked to the Tahoe, and I told the restaurant the whole situation, and that my car was going to be out there.

So that night we end up having to stay in my Tahoe the whole night. And my daughter was with Cheryl's mom. Cheryl's mom called me later on that night, and she said that Travis was there, but he was angry about something, and he was pretty under the influence of alcohol, and she didn't want that there. So she was trying to calm him down, or he would have to go.

So I told her to tell him just to calm down and I would be back first thing in the morning, as soon as the sun comes up to where I'm able to see everything.

He called me off and on that night, and I missed the video chat from 9:30 to 10:00, I think. And that was the last -- and we were trying to work things out on getting back together for our daughter. Sometimes I feel like I should -- I feel bad for not being able to accept that video call. I feel like

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

U.S. v. Allister Quintana

4492

maybe if I answered it, things would be different. But that's the last -- as soon as the sun came up, we jetted back. We got something to eat and we jetted back, and I went to pick up my daughter. And as we pulled up, and I walked up to the door to Cheryl's mom's house, his hat was outside.

Q. Whose hat?

A. Travis' hat. He wears a cap. And it was sitting outside in the snow. And I was like, "Oh, look there's Travis' hat. I wonder why it's there," you know.

So I got my daughter, and Cheryl is, like, "All right. What are you going to do now?"

I was, like, "I'm going to go look for Travis, so I can give him back his things, and maybe he can give me a few bucks to get something to eat for our daughter, or we can go out of town or something."

So I got my daughter, and I went back home. We were getting ready -- got my daughter ready, and we started looking for her dad. And so I was looking for him since. And that's pretty much that.

Q. And you never saw or talked to Travis again after February 2nd?

A. No. I was calling his phone. I looked

everywhere, all of his friends that he stayed, his family, nothing.

Q. And the missed call from him was late in the evening of February 2nd?

A. Yeah, it was at night.

Q. Did you know anything about Travis possessing Allister Quintana's debit card at some point?

A. Yes. He told me he had had it, but he told me he thought he lost it, because he was supposed to bail out Allister with that debit card.

Q. To be clear, you went to Pagosa Springs twice on February 2nd?

A. Yes.

Q. The first time was you and Travis, and the 2nd time was you, Cheryl, Allister and Andrew?

A. Yes.

Q. And the reason you couldn't drive back is it became dark, and the lights of your vehicle didn't work?

A. At all.

Q. Do you know if Allister Quintana's Instagram name is Danzig Crowley?

A. I have screenshots of those messages, and it does say that, but I don't have Instagram, or I

don't know anything about that.

Q. Do you know the name of Allister's girlfriend?

A. Jonessa.

Q. Is that Vigil?

A. I'm pretty sure.

Q. Can you tell us about something unusual you saw involving Andrew Bedwin's mother on February 13th of 2018?

A. That day me and Cheryl, we had our kids with us, and we were at Rose's house. We were watching movies with her son, Aaron, and our kids were just running around playing. She wasn't home. She came back intoxicated, yelling around, and it frightened our kids, so I told Cheryl, "Let's get the kids out of here and let's do something else, take them to the playground or something."

So as we were leaving she got in her van, and she was following us, like, really, really close and I noticed. So instead of going our usual route, I went a different way, and I noticed -- that's when I really did notice that she was following us, and I parked way up, because I sped up. And she parked down here off of Foothill, and I waited for her to leave. So I thought she went back home. So I was

like, "Well, Cheryl, should we just go back to your house and chill with the kids and make pizza or something for them?"

On the route back to Cheryl's house is Allister's house, and she lives on this side, and Allister lives right here. She lives on Ute Street above him. So, of course, the route we're going to pass Allister's house, going to her house.

As we were going by, I noticed her van -- Rose Bedwin's van in the driveway. And so I slowed down and I told Cheryl, I was, like, "What's Rose's van doing over there? Nobody is home, and Allister is in jail." No, he was somewhere -- yeah, he was in jail.

So I told Cheryl, like, "Should we go tell her to leave?" I was, like, "You have to be the one to tell her, because this is your grandma's house. You have more right to tell her to leave than I do. Tell her to leave, or we're going to call the cops."

We pulled in and she was going to jump out. I told her, "Wait. Let's see what she's doing." She walked from the front door to the garage closet, and she was just tossing things out, and she was looking around the car. There's a vehicle -- a car in the garage. She was looking on the floor, like, looking



around, and then she went to the front door and she was trying to open it. And she was looking around the porch and everything. We were just watching her, and I told Cheryl, "Go ahead. Get out tell her to leave. I don't know what she's looking for."

So she told her to leave. And she left, and when we asked her what she was doing there, she said that Andrew had told her to check on the house. So that confused me and Cheryl. And Cheryl is, like, if Andrew said that, he should be the one coming here himself and checking on the house and not sending you, intoxicated, looking for whatever you're looking for.

Q. And Andrew didn't live at that house, as far as you know?

A. No, he lived with his mom.

Q. Now, what's the relationship between Cheryl and Allister?

A. They are related.

Q. Cousins?

A. Yes.

Q. Did you have an opportunity to speak with somebody named Johnny McDonald?

A. Yes.

Q. Was Johnny McDonald in custody with

Allister Quintana sometime in the second week of February?

A. Yes.

Q. Did Johnny McDonald tell you that he spoke with Allister about what had happened inside his house?

A. Yes.

Q. Did Johnny McDonald tell you that Allister told him that he stabbed someone, beat the person, and put the body in his closet?

A. He said that him and Andrew put the body in the closet.

Q. Johnny said that Allister told him that Allister and Andrew had done that?

A. Yes.

MATTHEW MARTINEZ,

after having been first duly sworn under oath, was questioned and testified as follows:

EXAMINATION

BY MR. SPINDLE:

Q. Good morning, sir?

A. Good morning.

Q. Would you please introduce yourself to the Grand Jury?

A. Matthew Martinez.

Q. Matthew, did you get a subpoena to be here today?

A. Yeah.

Q. Do you understand you are not the target of this investigation?

A. Yeah.

Q. Do you understand there are currently no claims that you did anything wrong.

A. No -- excuse me?

Q. Do you understand that there are currently no claims that you did anything wrong?

A. Yeah.

Q. Do you understand you are currently under oath?

A. Yes.

Q. And you understand you must tell the truth?

A. Yeah.

Q. Do you understand if you do not tell the truth to the Grand Jury you may be charged and

convicted of perjury, obstruction of justice, false statements, each of which is punishable by up to five years imprisonment?

A. Yeah.

Q. Do you understand you may refuse to answer any questions that would incriminate you?

A. Yes.

Q. Matthew, how are you feeling this morning?

A. Just dehydrated, and pretty hungover.

Q. Was it your birthday recently?

A. Yes.

Q. Do you think you overdid it a little bit?

A. Yeah.

Q. Are you a little nervous, too?

A. Yes. That just makes it kind of worse.

Q. I only have a few questions for you.

Were you in Jicarilla Apache Detention Center the second week of February of 2018?

A. Yes.

Q. Were you in there with somebody by the name of Allister Quintana?

A. Yeah.

Q. Did you have a conversation with Allister Quintana during that period, the second week of February of 2018, in which Allister told you he was



planning to move to Santa Fe to attend school, once he was released from jail?

A. Yes.

Q. Did he ask you -- or tell you that he needed somebody to look after his house?

A. Yeah.

Q. And did he ask you, if you would help him clean up his house after he got out from jail, that he would allow you and Cheryl, your girl friend, to live in the house while he was gone?

A. Yeah.

Q. And is Cheryl Cachucha your girl friend?

A. Yes.

Q. Does she have some relation to Allister Quintana?

A. That is one of her first cousins, I think it was.

Q. The following evening, after having that conversation with Allister Quintana in the Jicarilla Detention Center in the second week of 2018, did you have another conversation with Allister Quintana in which he told you he was in deep shit, and that only certain people knew about it?

A. Yes.

Q. But did he not specify exactly what that

deep shit was?

A. Yeah, yeah, he didn't really say -- talk about it much.

Q. And then the next day did you have another conversation with Allister Quintana?

A. Yes.

Q. And at that time did he ask you to help him clean up something in his house when you two were released from jail?

A. Yes.

Q. And did he say that he needed to get something out of his house before it started to stink, and then made a comment that if he didn't get it out before it began to stink, it would result in a manslaughter charge?

A. Yeah.

HARLEY HOWLAND,

after having been first duly sworn under oath,

was questioned and testified as follows:

EXAMINATION

BY MR. SPINDLE:

Q. Would you please introduce yourself to the Grand Jury.

A. My name is Harley Howland, and I'm Travis' younger sister.

Q. That is Travis Howland?

A. That's Travis Howland's younger sister.

Q. Did you get a subpoena to that here today?

A. Yes, I did.

Q. And do you understand you are not the target of this investigation?

A. Yes, I do.

Q. Do you understand there are currently no claims that you did anything wrong?

A. Yes.

Q. Do you understand that you are currently under oath?

A. Yes.

Q. Do you understand you must tell the truth?

A. Yes.

Q. Do you understand that if you do not tell the truth to the Grand Jury, you may be charged and convicted of perjury, obstruction of justice, entering false statements, each of which is punishable by up to five years in prison?

A. Yes.

Q. Do you understand you may refuse to answer any question that would incriminate you?

A. Yes.

Q. You just mentioned Travis Howland was your older brother?

A. Yes.

Q. Do you know somebody by the name of Allister Quintana?

A. Yes.

Q. How do you know him?

A. Allister Quintana is my cousin through our grandmothers, and we all group up together. We claimed each other as brothers and sisters, because

41

he grew up with us.

Q. And is that kind of tribal tradition in Jicarilla?

A. Yes.

Q. And so you are pretty familiar with Allister's behavior?

A. Yes, I am.

Q. Does he have a bit of drinking problem?

A. Yes, he does.

Q. What about a cocaine problem?

A. That, he does. He continuously bought cocaine.

Q. Were you aware whether or not he had any ill will towards your brother, Travis?

A. Yes.

Q. How were you aware of that?

A. Last year, I'm guessing summertime, or before summertime, which is probably around June maybe July, he -- Travis Howland was with Allister Quintana's mom. And Allister did not like that because we all grew up together and we were siblings -- claimed each other as siblings. And they fought, and Allister beat him up at Allister's mom's house.

They did get over it, or so they say they

SANTA FE OFFICE 119 East Marcy, Suite 110 Santa Fe, NM 87501 (505) 989-4949 FAX (505) 843-9492
BEAN & ASSOCIATES, Inc. PROFESSIONAL COURT REPORTING SERVICE
MAIN OFFICE 201 Third NW, Suite 1630 Albuquerque, NM 87102 (505) 843-9494 FAX (505) 843-9492 1-800-669-9492 e-mail: info@litsupport.com
U.S. v. Allister Quintana
4505

42

did. That's pretty much the only reason why Allister had hard feelings toward my older brother, Travis.

Q. Now, you said Travis was with Allister's mother?

A. Yes.

Q. Do you mean in an intimate relationship?

A. Yes.

Q. Is Travis -- or was Travis related to Allister's mother?

A. No we're related through his dad.

Q. Did you stay at Allister's house from August of 2017 through January of 2018?

A. Yes, I did.

Q. Did you live there with your husband and kids?

A. Yes.

Q. But you moved out in the end of January?

A. Yes.

Q. Is your husband's name Michael?

A. Yes.

Q. When you first moved in in August of 2017, was the house a pretty messy place?

A. Yeah, it was a disaster -- pretty much a party house, pretty much people came and went whenever they felt like it. I was desperate for a

SANTA FE OFFICE 119 East Marcy, Suite 110 Santa Fe, NM 87501 (505) 989-4949 FAX (505) 843-9492
BEAN & ASSOCIATES, Inc. PROFESSIONAL COURT REPORTING SERVICE
MAIN OFFICE 201 Third NW, Suite 1630 Albuquerque, NM 87102 (505) 843-9494 FAX (505) 843-9492 1-800-669-9492 e-mail: info@litsupport.com
U.S. v. Allister Quintana
4506

43

home -- for a house and a place to stay. There's no housing in Dulce.

So I asked Allister, him being my little brother, my sibling, if we could move in, because it was a three-bedroom house. And he said, Yes. So it was really bad. The carpets were awful, to where the dogs were -- the dogs he had, or whoever had animals, would let them in and they would just go to the bathroom wherever they wanted. There was overstocked dishes and old food. The only food that was in the fridge was just old, molded. It was just really down.

Q. Did you do your best -- I'm sorry?

A. So, we cleaned it up. We pulled out the carpet in the back room and we cleaned that area up because of all of the dog poop on it. We shampooed the carpets out. We refixed the door. The door wasn't working. Actually, the front door was broken to where Allister was putting a couch against the door every night -- or every time he would leave the house he would put a couch against the door, and climb out the window. And that's how he was getting in and out of his house.

So when he moved in -- my husband does home improvement for a living, and he -- we got a new

SANTA FE OFFICE 119 East Marcy, Suite 110 Santa Fe, NM 87501 (505) 989-4949 FAX (505) 843-9492

BEAN & ASSOCIATES, Inc. PROFESSIONAL COURT REPORTING SERVICE
MAIN OFFICE 201 Third NW, Suite 1630 Albuquerque, NM 87102 (505) 843-9494 FAX (505) 843-9492 1-800-669-9492 e-mail: info@litsupport.com
U.S. v. Allister Quintana
4507

44

door, and he put it in. We were working on, like, making home improvements of just windows being fixed and stuff, just for the sake of our kids, you know.

It got to the point where things were going okay with Allister. He wasn't really home, like, a lot. He would come back probably for clothes, and then he would leave again.

Q. During that approximately six-month period that you lived there, did you keep it reasonably clean?

A. Yes.

Q. Tell me about a time that Travis stopped by while you lived there, to visit you and your children?

A. Travis came by one time, and -- to visit us, and Allister got upset. He started freaking out, and he is, like, "I don't want him here. He can't be here. Fuck this guy. No, I don't want to fucking see him."

And we were, like, "What's your problem," you know. And Michael was like, If you are going to treat people like that -- you know, you guys are brothers. Michael is godly man. He is a real Christian. And he pulled Allister aside, and he was -- Allister was trying to be -- because Michael

SANTA FE OFFICE 119 East Marcy, Suite 110 Santa Fe, NM 87501 (505) 989-4949 FAX (505) 843-9492
BEAN & ASSOCIATES, Inc. PROFESSIONAL COURT REPORTING SERVICE
MAIN OFFICE 201 Third NW, Suite 1630 Albuquerque, NM 87102 (505) 843-9494 FAX (505) 843-9492 1-800-669-9492 e-mail: info@litsupport.com
U.S. v. Allister Quintana
4508

was holding Allister back, Allister was holding -- like, making a fuss to try to get at Travis. So Travis had walked away, and he was, like, well, you know, if he doesn't want me here, then I'm going to leave.

Michael calmed down Allister and told him, you know, if -- you can't live like this. This is your brother, and you guys got to let bygones be bygones, you know, just talking to Allister.

Allister calmed down, but once Allister knew that Michael was a reasonable man, and not going to let certain things interfere, I guess, you would say -- we don't like want confrontation around our kids and around ourselves. So Allister calmed down by then, and ever since then he has never really through a fit around Michael, because Michael is really built guy. He is heavyset.

Q. He is significantly larger than both Travis and Allister?

A. Yes.

Q. Now, this altercation where Allister was trying to get at Travis, that was in the late summer of 2017?

A. Yes.

Q. Did you call the police on Allister at some

point in January of 2018?

A. Yes, I did.

Q. Why did you have to call the police on him?

A. Well, throughout -- it started in November. Allister was just acting out. "Acting out," meaning he -- Michael worked night shifts, from 12:00 a.m. all of the way up to 8:00 a.m. So me and the kids were home alone during the night. And right when Michael would leave, Allister would start playing loud music, inviting people over. You know, I would wake up in the middle of night, and be, like, There's so many people here. My kids are sleeping. It is loud music, loud noise.

I would go back there, and I would be banging on Allister's back door, and I would say, "What are you guys all doing here? I'm going to call the cops, if you guys don't get the hell out of here. You guys need to get the hell out of here. I have kids here. If the cops were to come they would take my kids. I'd be in trouble. You guys would all be in trouble. You know, like, get the hell out of the house. Like, leave."

So he would get mad, and that's happened, I'd say -- I'd say, like, nine or ten times from November to, like, when we moved out. And he was

just being a jerk. He was just drinking all of the time, treating us really bad. And so when we moved out, it was January 31st. But when we did call the cops -- your question was calling the cops, right?

Q. Yes.

A. So I got -- I heard that Allister had a domestic violence, and in my town or on the reservation they will charge you for harboring a fugitive. And I was just tired of Allister's shit, too, you know.

If you are wanted, then I'm going to get you out of the house, and we'll figure out where to go from there. So, at least we won't be bothered at night with partying and random people in the house. So we called our pastor up. He's a cop, and I said, "Does Allister have a warrant on him?"

And he texted me back and he said, "Yes, he does. Where is he at?"

I said, "He's here at the house. You can come and get him."

He said, "Okay, I'm coming with another unit."

So they came to the house, and then we opened the door, Allister Quintana, Brian Cachucha, Andrew Galleon, were all arrested that day. Allister

was really mad at us. He was, like, "The cops couldn't come have come in if you guys didn't open the door. Why did you open the door? They can't do that. This it bullshit." And, "This is my house, and these guys don't even live here," or "they're not in charge of my house." And he was just trying to find every excuse in the book, and he was really mad at us, though.

Q. Approximately, when was that?

A. January, like -- like, early January. He was in jail for a while for domestic violent.

Q. Did he get out of jail on January 31st of 2018?

A. Yes.

Q. Did he come home on January 31st of 2018?

A. Yes.

Q. How did he treat you when he came home?

A. He was really upset. He was really mad. We were making dinner, and it was our last night there.

When we had called the cops on Allister for domestic violence, and he was thrown in, we decided we needed to move because I didn't want confrontation, and I was just tired of it. And my bosses -- my co-workers, they all pitched in to get



us a temporary trailer put at the RV park. So we were moving. And then my sister was going to take care of my kids until we found appropriate housing, so that was the plan. And that night of the 31st, we had already gotten everything out except for my dressers, and that's what we were doing.

So I figured, since we're here, we should just cook dinner and then go back. So we decided to cook dinner. And I was making the fire because the heater didn't work at that time. And then I was sitting in front -- I was sitting in front of the fire trying to make it. Michael was in the kitchen cooking. The kids were in the living room and Allister just walked through the door, and he goes, "What the fuck are you guys still doing here? You guys are still here? Like, why are you guys still here?"

And then he slammed the door really hard and he said, I don't want you guys here no more. I don't know why the fuck you guys are still here. So he, like, stomped his feet all of the way back to his room. And then when he stomped his feet back to the room I was, like, "Really?" And I was kind of shocked, too, because I didn't know he was getting out of jail. And this was about 6:00 or 7:00 p.m.

So I called my older sister and Michael -- I told Michael about it first, and I said, "You know, Allister is talking shit. He's throwing a fit. I don't want to be here."

And he is, like, "You know, fuck that." He's, "Allister, like, what's your problem?" And Allister is all, "I don't fucking want you guys here," and they were yelling at each other through the room door. And I figured I better call Heaven or -- Heaven's my older sister. I said, I better call my sister or my cops, because this is going to get crazy if Michael ends up hurting him. On the reservation, if you are nontribal member, and you hit a tribal member, they'll charge you pretty good.

Q. Is your husband a nontribal member?

A. Yes, he is. So after that we had just -- I left with the kids, because things were already getting bad. So when I left with the kids, I called my sister. My sister came over. She picked me and the kids up, and then we went to her house. And then she called Michael and said, "You better come over here. I don't trust those people."

But before we were leaving Allister's house, me and my kids, Benny Collins walked in through the door with a big old case of beer, like,

24 pack, Cheryl Cachucha walked in with a fifth, this guy named Warren Cachucha came through the door, and I was, like, "Oh, you're here for the party," because I was upset. Right when Allister gets back that night he started -- like, a bunch of people walked through the door with alcohol. I was like "Sorry," I was like I was just being sarcastic.

So me and my kids left, and then Heaven was, like, "I don't trust all of those people there with Michael." I had a vision that they are probably going to gang up on him or something. So we called Michael, and Michael was, like, "I can't leave." He is, like, "I can't go nowhere. This lady blocked me in." He is, like, they said "They're calling the cops, and I stole from them."

I was, like, "What the hell?" So I called the cops myself and I said, "Just so I could have on record on my end," I said, "You know, Allister Quintana is blocking in my husband. We just moved out and we don't want no confrontation. We need the cops there."

So we went back with the cops. My kids stayed with my older sister, and the cops pretty much told us, "Just go." They are like, "We know who Allister is. We know what kind of person he is."

This is what they said -- the cops told my husband and I, "We know what kind of person Allister is." He is, like, "Just go. He's a little asshole. Just go." He's, like, "We'll deal with this. This isn't really nothing."

We were, like, "Okay." So we left. They got that lady who was Judith -- I don't know her last name, but they told her to move her vehicle out from behind my husband's ride.

Q. You're talking about the police did this?

A. Yes. They got her moved out of there, and then we left. And that was the last time that I ever conflicted with Allister.

Q. And that was on January 31st of 2018?

A. Yes.

Q. Travis wasn't at the house at that time?

A. No.

Q. When you moved out, was there any blood in the house?

A. No.

Q. Was there any strange smells?

A. No.

Q. And did you see Travis or Allister on February 2nd or 3rd of 2018?

A. On February 2nd, me and my husband went --



we work together at the EMS. So during lunch we went to the store, and on our way into the store we saw Allister Quintana with Benny Collins and Howard Martinez. They were altogether, and they all walked into the store, and I said, "Today is his birthday." And Michael goes, "Well, they're just going to tear up the house. I'm just done with that."

Q. Whose birthday?

A. Allister Quintana's birthday.

Q. February 2nd?

A. Yes.

Q. And did you see Allister any more after bumping into him at the store at lunch on February 2nd?

A. No.

Q. Did you ever here from your brother, Travis, again?

A. No, I didn't.

Q. When did you discover that your brother, Travis, was dead?

A. On February 14th. It was around 4:00 p.m., and I'm an ambulance driver.

Q. Please continue.

A. It was about 4:00 p.m. My boss -- I just got a phone call, and they said, "They found a dead

body at your grandma's." And my grandma's, which is Allister's house, number 66 Navajo Street.

And they said, "Oh, shit," like "Allister, is he okay? Is Allister okay? Like what the?" And I'm an ambulance driver, and I was the only one there to drive the ambulance. So we went up there for a call, and on the call they didn't say that it was a DOA. They just said an intoxicated person, possible transport to San Juan Regional Medical Center.

Q. "DOA" means "dead on arrival"?

A. Yes. So we went. I got out of the ambulance, and already there was tape "Do not cross crime scene" tape from the driveway. And there were cops and they are, like, "You can't go in. You can't go in."

I said, "Is Allister okay? Is Allister okay?"

They said, "He's in jail."

"Oh, okay, well who is it? Who is it?"

They're, like, "We can't tell you that. You can't go in. We can't tell you that."

I said, "Who is it? I used to live here. This is grandmother's house. This is my little brother's house. I want to know what's going on."

The police officer showed me pictures of

Travis, but at the time I didn't know it was him. At the time I didn't know it was him because the body was too bloated. And the body was -- the way he was, I kept saying -- I said, "I need to look for my -- I need to look for my brothers," which is Daniel Benedict and Travis Howland, because their lifestyle is street everyday. They were good people but they had an alcohol problem. And -- but that was my first instinct, because all of my brothers partied together, and were stupid together.

I found Daniel. We just never found Travis. And that was on February 14th, around 4:00 p.m. And I didn't find out it was Travis until probably a week later, because -- everybody was already saying it was him. But we didn't find out officially that it was Travis until DNA results came back. And they didn't even identify him through DNA. They identified him through his fingerprints.

Q. Ms. Howland, I hate to ask you to think about this, but was there something different about his hair that you observed in the pictures, versus his hair the last time you saw him?

A. Yeah, his hair was cut. He had really long, beautiful hair. His hair was long, probably to his thighs, and the person that I seen, it was about

shoulder length, cut hair. That's why I kept telling my sister, I said, "He is probably somewhere else. That person has short hair. It's not him." I said it wasn't him. "It's not him. We got to keep looking for him." And it just turned out to be him.

Q. Ms. Howland, just to be clear, on February 2nd and February 3rd of 2018, not only did you not see Travis or Allister, you didn't speak with either of them on the phone or anything?

A. No.

Q. And did you give an interview to the FBI in this matter?

A. Yes, I did.

Q. And did you tell them everything you knew?

A. Yes, I did.

Q. And did you understand it was the important to be truthful?

A. Yes.

Q. And were you very truthful with them?

A. Yes.

Q. Did you give Benny Collins a ride to talk to them, as well, on February 14th of 2018?

A. Yes, I did.

Q. Why did you give Benny Collins a ride to the FBI?

A. Well, that's the thing, after the call I was still trying to figure that out. After the call, I went back to work, because I was frantic. And I was going to drop my -- drop a unit off, so I could leave work and go look for Travis or Daniel and make sure they were okay.

Right when I got back from work -- right when I got back to the station, Benny Collins was on hold for me. And I was, like -- I didn't know at the time who was on the phone for me. All my co-workers said is, "You got a phone call. They've been on hold this whole time."

I was, like, "Okay." I figured maybe it was my husband, or maybe my sister. So I answered the phone, and he said, "Hey, can you take me up to the cops? Can you take me up there? Can you, please, take me up there?

And I said "Who's this?"

And he goes, "It's Benny."

And I was, like, "Benny, Benny -- Benny who?"

"Benny Collins?"

I said, "Oh." And I said, "Yeah, I'm about to leave work, but why?"

And he is like, "I just heard that my truck

was up there, and I just heard that they think I'm part of it. They think I'm part of what's going on up there, and I need somebody to pick me up. I need a ride. I need to get up there. Can you come get me? Come and get me, please."

He's, like, literally crying. I said, "Okay, my husband is going to pick me up from work here in a little bit. I'll take you up there."

And we went to go pick him up -- I don't know what time this is, probably around 5:00, 5:30. So we picked up Benny Collins at his house. And from there he got in, and he kept saying, "I never thought my best friend could do this. I never thought my best friend could do this. This is just so fucking crazy." And he was, like, "I was no part of this."

And I said, "Well, who is it?" I said, "Who is it? Who's up there?" Like, "What happened?"

And he said, "I don't know. But if people are saying my truck is up there, I don't want to be part of this." He's, like, "I do give Allister rides and stuff, but I'd never be a part of something like this."

We got up there. Then Benny Collins got out of my vehicle to talk to FBI, or whoever was up there at the time. It was Aaron Julian, which is our

criminal investigator at the tribe. So he talked to Aaron for, I'd say, about five minutes. We waited for him. And then we took him back home and he goes, "I'm sorry, so sorry." He said, "I'm sorry."

I said, "Okay," you know, because I still had hope that that wasn't Travis. You know, that was the further thing from my mind. I didn't think it was going to be him. I was still looking for him. But now -- that was the only time I've given Benny a ride or ever talked to Benny in my whole life, is when he called me randomly begging me to take him up to go talk to the police.

Where were the police when you took -- where did you take Benny to the police?

A. To number 66 Navajo Street, the house Allister resided in.

And what day was it that you saw Allister, Benny and Howard at the grocery store?

A. On the 2nd of February, around lunchtime.

JENESSA VIGIL,

after having been first duly sworn under oath, was questioned and testified as follows:

EXAMINATION

BY MR. SPINDLE:

Q. Good morning, ma'am?

A. Good morning.

Q. Did you get a subpoena to be here today?

A. Yeah.

Q. Do you understand you are not the target of this investigation?

A. Yes.

Q. Do you understand there are currently no claims that you did anything wrong?

A. Yes.

Q. Do you understand that you are currently under oath?

A. Yes.

Q. And do you understand you must tell the truth?

A. Yeah.

Q. Do you understand that if you do not tell the truth to the Grand Jury, you may be charged and

convicted of perjury, obstruction of justice and/or false statements, each of which is punishable by up to five years in prison?

A. Yes.

Q. Do you understand you may refuse to answer anything that may incriminate you?

A. Yeah.

Q. Would you please introduce yourself to the Grand Jury?

A. Hello. My name is Jenessa Vigil.

Q. Ms. Vigil, you are a little soft spoken. Will you move the microphone towards you.

A. My name is Jenessa Vigil.

Q. How do you Allister Quintana?

A. I used to date him.

Q. How long did you date him?

A. About four months.

Q. Can you give an approximate range?

A. Since --

Q. I see you have some notes. Are you relying on some notes?

A. Yeah, just to help me out. Since September 29th, I think, and to December 26.

Q. And did you interact with him on social media during that time?

A. Yeah.

Q. Did you guys frequently communicate by Intragram Messenger?

A. Yes.

Q. And is your name on Instagram Messenger Ms. Underscore, not, period, S-A-W-R-R-Y?

A. Yes.

Q. So "Ms. Not Sawrry"?

A. Yes.

Q. And his name on Instagram "Danzig Crowley"?

A. Yes.

Q. And did you -- is that your usual course of communicating with him?

A. Either that or Snapchat.

Q. And you've never heard of anyone else using his account name on Instagram?

A. No.

Q. And he wouldn't let anyone use his Instagram account?

A. No, he wouldn't.

Q. Was Allister ever violent with you when you were dating?

A. No.

Q. He was never violent with you?

A. No.

Q. He never choked you or anything?

A. Well, there was an incident between us, but other than that, no.

Q. What happened in that incident?

A. Like, from the beginning, like, what happened?

Q. Yes.

A. Well, I went over to spend Christmas with him, and I think New Years, too. And I didn't have a good feeling of being there, so I kept trying to tell him if I could, like, leave. But he was making us dinner, and I just didn't feel right. And he just didn't want to let me go, because we were supposed to spend that time together. And my family was out of town, too, so that's why I wanted to stay, too.

Something happened, and he just misjudged everything, and, yeah, he choked me.

Q. Did you lose consciousness?

A. Probably.

Q. Did you hang out with him in person on February 2nd or 3rd of 2018?

A. No.

Q. But you had some Instagram conversations with him on February 2nd and February 3rd of 2018?

A. Yeah.

Q. And on February 2nd he was communicating with you, trying to get you to take him back, right?

A. Yeah.

Q. He wanted to date you again?

A. Yeah.

Q. And then on February 3rd of 2018, you guys began text messaging pretty early in the morning?

A. Yeah.

Q. In fact, Allister instant messaged you on Instagram at 2:18 a.m. regarding meeting up with him the next day, right?

A. Yeah.

Q. And for the next several hours, on February 3rd, in the middle of night, early morning, you kept turning him down, right?

A. Yeah.

Q. And then at about 5:18 a.m. on February 3rd of 2018, he told you he had been in Pagosa Springs that day, right?

A. Yeah.

Q. And about 6:27 a.m., you asked him why Cheryl was in Pagosa?

A. Yes.

Q. That is referring to Cheryl Cachucha?

A. Yes.



### Page 65

```
 1    Q.   She was still stuck in Pagosa?
 2    A.   Yes, because she messaged me at the same
 3  time.  She was asking me to go and -- see if I could
 4  pick her up, her and Aileen.
 5    Q.   Kutch?
 6    A.   Yeah.
 7    Q.   And about 6:28 a.m., Allister responded
 8  with, "What? She got a ride home. Me and Andrew had
 9  to walk and got picked up"?
10    A.   Yeah.
11    Q.   And about 6:35 a.m. you responded -- I'm
12  sorry he, responded, she said that -- no, you
13  responded, "She said the lights don't work and
14  they're stuck? What happened?" right?
15    A.   Yeah.
16    Q.   Then about 6:37 Allister responded with,
17  "Everything happened"?
18    A.   Yeah.
19    Q.   And about 6:43 a.m. you inquired, "What do
20  you mean by that"?
21    A.   Yup.
22    Q.   And about 6:52 a.m. Allister responded,
23  "Like PPL drinking and arguing and dumb shit," right?
24    A.   Yeah.
25    Q.   And "PPL" he meant "people"?
```

U.S. v. Allister Quintana — 4529

### Page 66

```
 1    A.   Yeah.
 2    Q.   Shorthand?
 3    A.   Yes.
 4    Q.   And about 6:53 a.m. you inquired, "Are you
 5  drunk"?
 6    A.   Yeah.
 7    Q.   Right?
 8    A.   Yeah.
 9    Q.   And about 6:54 Allister responded with, "I
10  wish. I'm kicking some ass"?
11    A.   Yes.
12    Q.   Then about 6:55 a.m., you inquired, "Why,"
13  right?
14    A.   Yeah.
15    Q.   And about 6:58 a.m. Allister replied,
16  "Because thought I had family, but now I'm by
17  myself -- but now I know I'm by myself, and lost you
18  and mad at the world, and trying to change. Just
19  been through a lot," right?
20    A.   Yeah.
21    Q.   About 7:15 a.m. you told him "Have fun and
22  be safe. I can't talk at the moment now," right?
23    A.   Yes.
24    Q.   And about 7:25 a.m. Allister inquired, "But
25  why?" And "Same here. About to kill someone,"
```

U.S. v. Allister Quintana — 4530

### Page 67

```
 1  right?
 2    A.   Yeah.
 3    Q.   And that was around 7:25 a.m. on
 4  February 3rd of 2018?
 5    A.   Yeah.
 6    Q.   And about 7:27 a.m., same day, you asked,
 7  "Why?" And "I hate myself right now."
 8    A.   Yeah.
 9    Q.   And about 7:36 a.m. Allister responded,
10  "Have to do some bat man shit."
11    A.   Yeah. Yes.
12    Q.   Is he a fan of the comic book character
13  Batman?
14    A.   Yes.
15    Q.   But that is spelled in one word,
16  B-A-T-M-A-N, and this one, "bat" and "man" were two
17  different words?
18    A.   On auto correct.
19    Q.   And about 7:37 a.m. you asked "To who,"
20  right?
21    A.   Yeah.
22    Q.   And about 7:37 a.m., February 3rd, 2018,
23  Allister responded, "Don't worry about it. Shit all
24  over the house. Nigga scarred," right?
25    A.   Yeah.
```

U.S. v. Allister Quintana — 4531

### Page 68

```
 1    Q.   And you didn't speak with him the rest of
 2  that day, right?
 3    A.   Yeah, I didn't.
 4    Q.   Ms. Vigil, have you spoken with Allister
 5  since May 25th of 2018?
 6    A.   No.
 7    Q.   You haven't spoken with him on the phone or
 8  by Instagram or Snapchat or anything?
 9    A.   No.
10    Q.   And you didn't see him on February 2nd or
11  February 3rd of 2018, right?
12    A.   Yeah, I didn't see him.
13    Q.   And you were interviewed by the FBI in this
14  matter?
15    A.   Yeah.
16    Q.   And you provided a statement, and
17  understood how important it was to tell the truth?
18    A.   Yeah.
19    Q.   And you did tell the truth, right?
20    A.   Yeah.
21  [redacted]
22  [redacted]
23  [redacted]
24  [redacted]
25  [redacted]
```

U.S. v. Allister Quintana — 4532

[redacted]

[redacted]

[redacted]

STATE OF NEW MEXICO

COUNTY OF BERNALILLO

REPORTER'S CERTIFICATE

I, Arlette McClain, New Mexico CCR #85, DO HEREBY CERTIFY that the proceedings in the above-entitled cause were reported by me stenographically on June 13, 2018, and that the foregoing is a true and accurate transcription of my shorthand notes.

I FURTHER CERTIFY that I am neither employed by nor related to any of the parties or attorneys in this case, and that I have no interest in the final disposition of this case in any court.

Arlette McClain
Certified Court Reporter #85
License Expires: 12/31/18

(610N)