Joseph Spindle

RECEIVED
AUG 07 2018
U.S. ATTORNEY'S OFFICE
Albuquerque, NM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Case No.: 18-MJ-1776

IN RE: ALLISTER QUINTANA

BEAN & ASSOC'S, INC.
GRAND JURY MATERIAL

TRANSCRIPT OF PROCEEDINGS
MATTER # 15
July 10, 2018

TESTIMONY OF: JOHNNY MCDONALD, ALICIA RAE VIGIL, BRIAN CACHUCHA, BENNIE COLLINS, II

BEFORE: THE FEDERAL GRAND JURY
Albuquerque, New Mexico

A P P E A R A N C E S

For the Government:

MR. JOSEPH SPINDLE
Assistant United States Attorney
Post Office Box 607
Albuquerque, New Mexico 87103

REPORTED BY: Peggy Jo Gonzales, CM, NM CCR 145
Bean & Associates, Inc.
Professional Court Reporting Service
201 Third Street, Northwest, Suite 1630
Albuquerque, New Mexico 87102

(757N-PJ)

[redacted]

[redacted]

[redacted]

JOHNNY McDONALD,

after having been first duly sworn under oath, was questioned and testified as follows:

EXAMINATION

BY MR. SPINDLE:

Q. Good afternoon, Mr. McDonald.
A. Good afternoon.
Q. Did you get a subpoena to be here today?
A. Yes, I did.
Q. Do you understand that you are not the target of this investigation?
A. Yes.
Q. Do you also understand that there are currently no claims that you did anything wrong?
A. Yes.
Q. And do you understand that you are currently under oath?
A. Yes.
Q. And do you understand that you must tell

GOVERNMENT EXHIBIT 2
PENGAD 800-631-6989

5

the truth today?

A. Yes.

Q. Do you understand that if you do not tell the truth to the grand jury, you may be charged and convicted of perjury, obstruction of justice, and/or false statements, each of which is punishable by up to five years imprisonment?

A. Yes.

Q. Do you understand that you may refuse to answer any question that would incriminate you?

A. Yes.

Q. Do you know somebody by the name of Travis Howland?

A. Yes.

Q. How did you know Travis Howland?

A. When I made it to Dulce, New Mexico, he became a pretty good friend --

[REDACTED] Can you speak up? I'm sorry, sir.

[REDACTED] [REDACTED] Move closer to the microphone.

A. When I made it to Dulce, New Mexico, he became a pretty good friend of mine, and I ended up staying with him, him and his mother.

Q. Approximately how long did you know Travis

SANTA FE OFFICE 119 East Marcy, Suite 110 Santa Fe, NM 87501 (505) 989-4949 FAX (505) 843-9492
BEAN & ASSOCIATES, Inc. PROFESSIONAL COURT REPORTING SERVICE
MAIN OFFICE 201 Third NW, Suite 1630 Albuquerque, NM 87102 (505) 843-9494 FAX (505) 843-9492 1-800-669-9492 e-mail: info@litsupport.com
U.S. v. Allister Quintana 4541

6

Howland?

A. I'd say about at least nine months.

Q. How long did you stay in Dulce?

A. About nine, nine and a half months.

Q. Okay. You're no longer living in Dulce?

A. No.

Q. Okay. Do you know somebody by the name of Allister Quintana?

A. Yes, I do.

Q. How do you know Allister Quintana?

A. Through -- mostly through jail, when I was incarcerated in Dulce, New Mexico.

Q. Were you in jail in Dulce with Allister in the beginning of February of 2018?

A. Yes, I was.

Q. And were you in jail until February 15th of 2018?

A. February 13th.

Q. February 13th of 2018?

A. (No audible response.)

Q. A few days before your release, did Allister come to your bunk and speak with you?

A. Yes, he did.

Q. Was it only the two of you in the bunk?

A. Yes, it was.

SANTA FE OFFICE 119 East Marcy, Suite 110 Santa Fe, NM 87501 (505) 989-4949 FAX (505) 843-9492
BEAN & ASSOCIATES, Inc. PROFESSIONAL COURT REPORTING SERVICE
MAIN OFFICE 201 Third NW, Suite 1630 Albuquerque, NM 87102 (505) 843-9494 FAX (505) 843-9492 1-800-669-9492 e-mail: info@litsupport.com
U.S. v. Allister Quintana 4542

7

Q. Did he tell you that he and someone named Andrew tortured a man at his house and put him in a closet?

A. Yes.

Q. Did Allister admit that he and Andrew killed that man?

A. I wouldn't say killed. They said he was still alive when they put him in the closet.

Q. When they put him in the closet?

A. Yes.

Q. Did he say that anyone else helped him kill the man other than Andrew, or put the man in the closet?

A. No.

Q. Would he tell you the identity of the man that they tortured and put in the closet?

A. No.

Q. Did he say that he left the heater on in his house because they were worried about the body decomposing?

A. Yes.

Q. So he acknowledged that he knew the person was dead eventually, but at the time that he was telling you this he said he'd put them -- the man in the closet before he had died?

SANTA FE OFFICE 119 East Marcy, Suite 110 Santa Fe, NM 87501 (505) 989-4949 FAX (505) 843-9492
BEAN & ASSOCIATES, Inc. PROFESSIONAL COURT REPORTING SERVICE
MAIN OFFICE 201 Third NW, Suite 1630 Albuquerque, NM 87102 (505) 843-9494 FAX (505) 843-9492 1-800-669-9492 e-mail: info@litsupport.com
U.S. v. Allister Quintana 4543

8

A. Yes.

Q. Did you speak with the FBI Special Agent Lance Roundy and a Jicarilla Police Department Officer, Arron Julian, about what Allister told you on April 16th of 2018?

A. Yes.

Q. And you understood how important it was to tell the truth?

A. Um-hum.

Q. Was that a yes?

A. Yes.

Q. And did you tell the truth to those agents?

A. Yes, I did.

Q. And after telling the FBI about the conversation that you had with Allister in jail that you testified about today, did you discuss options with them to keep you safe?

A. Yes.

Q. Did they discuss witness protection?

A. Yes.

Q. Did they discuss assisting you with resources to move you out of state?

A. Yes.

Q. And did you ever accept any assistance from law enforcement for cooperation?

SANTA FE OFFICE 119 East Marcy, Suite 110 Santa Fe, NM 87501 (505) 989-4949 FAX (505) 843-9492
BEAN & ASSOCIATES, Inc. PROFESSIONAL COURT REPORTING SERVICE
MAIN OFFICE 201 Third NW, Suite 1630 Albuquerque, NM 87102 (505) 843-9494 FAX (505) 843-9492 1-800-669-9492 e-mail: info@litsupport.com
U.S. v. Allister Quintana 4544

A. No.
Q. But you moved out of the state on your own accord?
A. Yes.
Q. When did you last have contact with Allister Quintana?
A. I can't remember the date approximately, but the date when I was released from DOC of Dulce.
Q. So you're thinking it was February 13th?
A. It was either -- I think it had to to be in April.
Q. You did -- oh, it was in April. I'm sorry, so you were -- you were released on the 13th of February. Did you go back to jail --
A. Yes, I did.
Q. -- at some point? When did you go back to jail?
A. March I think it was 13th, too, March 13th or March -- March 9th to the 13th. I can't remember approximately, but...
Q. Sometime in that range, you went back to jail in Dulce?
A. Yes.
Q. And was Allister Quintana still in custody at that time?

A. Yes, he was.
Q. And did you have any additional conversations with him about what had happened?
A. No.
Q. Did he discuss Travis Howland in any way?
A. No. Ever since then, his name never came up ever again. Not once did he ever bring that topic or anything about that up.
Q. So you haven't talked with him or had no contact with him since May 25th of 2018?
A. Yes.
Q. You have?
A. No, that's -- that's when I was released, and I flew back to Montana that same day.
Q. Okay.

ALICIA RAE VIGIL,

after having been first duly sworn under oath, was questioned and testified as follows:

EXAMINATION

BY MR. SPINDLE:
Q. And I'm sorry, did you say that you swear to tell the whole truth and nothing but the truth?
A. Yeah.
Q. Would you pleases introduce yourself to the grand jury.
A. I'm Alicia Rae Vigil.
Q. Ms. Vigil, did you get a subpoena to be here today?
A. Yes.
Q. Do you understand that you're not the target of this investigation?
A. Yes.
Q. Do you understand that there are currently no claims that you did anything wrong?
A. Yes.
Q. And you're a little soft spoken, so please speak into the mic as much as possible, okay.
A. Okay.
Q. Do you understand that you're currently under oath?
A. What does that mean?
Q. The oath that was just administered to you --
A. Oh, yeah.

Q. -- that you swore to tell the truth.
A. Yeah.
Q. So you understand that you're under oath?
A. Yeah.
Q. Do you understand that you must tell the truth?
A. Yes.
Q. Do you understand that if you do not tell the truth to the grand jury, you may be charged and convicted of perjury, obstruction of justice and/or false statements, each of which is punishable by up to five years imprisonment?
A. Yes.
Q. Do you understand that you may refuse to answer any question that would incriminate you?
A. Yes.
Q. Ms. Vigil, is your nickname Ishi?
A. Yes.
Q. And do you know somebody by the name of Allister Quintana?
A. Yes.
Q. How do you know Allister?
A. We used to date.
Q. How long did you guys date?
A. All together, probably like four, five



years, but at the end, like, it started, like, drifting -- drifting away, and -- yeah.

Q. And so about four or five years ago you guys started dating?

A. Yeah.

Q. And were you consistently dating that whole time or was it on again, off again?

A. I think maybe consistently. Like just mainly texting and -- yeah.

Q. Okay.

A. And school.

Q. Okay, did you ever break up with Mr. Quintana?

A. Yeah.

Q. When did you break up with Mr. Quintana?

A. Maybe -- I think, honestly, like me and him just like broke up like -- I think it was his choice.

Q. Okay, so when did he break up with you?

A. Well, the first time was around -- or in 2016, and I think last year around August.

Q. So after you broke up in 2016, you got back together?

A. Yeah. I think it was in the -- or it was in the summertime.

Q. Okay.

A. Yeah.

Q. And you were back together in 2017 for some time?

A. Yeah.

Q. And did you break up again in 2017?

A. Yeah.

Q. When did you break up in 2017?

A. Around August.

Q. Did you still socialize with Mr. Quintana after breaking up with him?

A. Yeah, I tried to, but, like -- I don't know. Like it was -- yeah, it was something like that.

Q. Do you still have feelings for Mr. Quintana?

A. A little bit, yeah.

Q. Would you hang out at his house as recently as 2018, the beginning of this year?

A. In the beginning?

Q. Yes.

A. Yeah.

Q. Is his house 66 Navajo Street in Dulce, New Mexico?

A. Yeah.

Q. And is that within the Jicarilla Apache

Reservation?

A. Yes.

Q. Do you know somebody by the name of Andrew Bettelyoun?

A. Yeah.

Q. Describe your relationship with Andrew Bettelyoun?

A. Right now we're just friends, but...

Q. You said "right now." Were you more than friends at one point?

A. Yeah.

Q. Okay. Did you date Mr. Bettelyoun, as well?

A. We tried, but, I don't know, it didn't just happen or -- I don't know.

Q. When did you date Mr. Bettelyoun?

A. Probably like in the middle of February or the end, but we were just like talking, but it wasn't, like, really dating. It was just like -- something like that.

Q. You said the middle of February to about the end of February of 2018?

A. Yeah.

Q. So this would have been in the last few months?

A. Yeah.

Q. Okay. And you're no longer dating Mr. Bettelyoun?

A. No.

Q. Do you still have feelings for him?

A. No.

Q. Okay. Did you know somebody by the name of Travis Howland?

A. Yes.

Q. Describe your relationship with him.

A. He was, I would say, like a brother, friend to me.

Q. You never had an intimate relationship with Mr. Howland?

A. Hum-um.

Q. When was the last time you saw Mr. Howland?

A. It was kind of towards the end of January, and it was at Walmart in Pagosa, Colorado.

Q. You never saw Mr. Howland after seeing him in Pagosa, Colorado, at a Walmart at the end of January 2018?

A. No. That was the last time I seen him.

Q. Okay. Was there bad blood, in your opinion, between Travis and Allister?

A. What do you mean?



17

Q. How did they feel about each other?
A. They seemed like -- like a brother type relationship.
Q. Did you ever see Allister and Travis get into any physical altercations?
A. Yeah.
Q. When was that?
A. Last year around the summertime.
Q. Do you know why they got into a physical altercation?
A. Well, sometimes, like, Travis, like, gets drunk sometimes and, like, whispers stuff, like, under his voice, I guess. I don't know, like, little stuff like that. I don't know. And plus, like, he was messing around with his mom, too, and that kind of made him more mad, but --
Q. When you say "with his mom," Travis was messing around with Allister's mom?
A. Yeah.
Q. Did that make Allister upset?
A. Yeah.
Q. When you say messing around, are you referring to sexual relations?
A. Yeah.
Q. Did you go to Allister's house on his

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

U.S. v. Allister Quintana
4553

18

birthday in 2018?
A. No.
Q. His birthday is February 2nd, correct?
A. Yeah.
Q. You didn't go to his house on February 2, 2018?
A. No.
Q. On February 2nd or 3rd of 2018, did you see Allister Quintana, Andrew Bettelyoun, Bennie Collins or Dominique Haines?
A. Yeah.
Q. Who did you see?
A. Allister, but that was, like, after his birthday.
Q. You saw Allister the day after his birthday?
A. Yeah.
Q. So February 3rd of 2018, you saw Allister?
A. Yeah.
Q. Where did you see him?
A. At his house.
Q. You went to his house that day?
A. Yeah.
Q. About what time did you arrive at his house?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

U.S. v. Allister Quintana
4554

19

A. It was around the evening time.
Q. What were you guys doing at his house?
A. Just talking about, I don't know, like court stuff, because I had to go to court, too, in Durango and stuff, and, I don't know, he was just asking me about, like, my family and -- yeah.
Q. Describe the condition of Allister's house on February 3rd of 2018?
A. It looked dark because it was around the evening time, and I was -- or, yeah, I just went straight to his back room and we started talking, and we were drinking, too, and -- yeah, and I had to use the restroom and, like, his first bathroom to the right, like walking out of his room, I kind of, like, noticed the door was, like, kind of messed up, and, I don't know, it seemed like Kool-Aid splatters or -- it wasn't that big, but I kind of noticed that, but -- and, plus, I don't really use that restroom. So I just went to, like, the first bathroom because that toilet is, like, kind of messed up in that -- in that bathroom.
Q. When you say Kool-Aid splatters, were they red in color?
A. Yeah.
Q. Did you notice any defects to the carpet in

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

U.S. v. Allister Quintana
4555

20

the hallway?
A. No.
Q. Did you notice a large puddle of red liquid?
A. No.
Q. Do you remember speaking with me outside and you mentioned that you thought somebody maybe had spilled Kool-Aid, or something, in the hallway?
A. Yeah, but I was meaning the bathroom --
Q. Oh, in the bathroom?
A. -- like right there, yeah, on the walkway.
Q. Did you have sexual relations with Allister that day?
A. Yes.
Q. Approximately how much alcohol did you have to drink at Allister's house?
A. Maybe a fifth and a pint.
Q. A fifth of vodka?
A. Yeah.
Q. And a pint of what?
A. The same thing.
Q. Vodka?
A. Yeah.
Q. You, by yourself, drank a fifth of vodka and --

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

U.S. v. Allister Quintana
4556



A. No, like, we shared it.
Q. Okay. Between just you and Allister?
A. Yeah.
Q. Who else was at his house that day?
A. Well, earlier -- or not earlier, but -- I think there was, like, some lady that was, like, outside, like, knocking on his window, and I think she was, like, asking for Travis. I'm not too sure if it was Travis or Andrew, but, yeah. And he's like, I don't know and -- yeah.
Q. So a lady was asking for either Travis or Andrew outside of his house?
A. Yeah.
Q. Do you know who that lady was?
A. No, because I was, like, sitting on the couch and you know how, like, the windows are all high, and -- yeah.
Q. And was Andrew Bettelyoun there on the 3rd while you were there?
A. I don't think so, no.
Q. What about Bennie Collins?
A. No.
Q. What about Dominique Haines?
A. No.
Q. So the only person you saw at Allister

Quintana's house on February 3rd of 2018 was Allister?
A. Yeah.
Q. On March 8th, were you interviewed by Special Agents Lance Roundy and Monty Waldron with the FBI?
A. Yes.
Q. Did you understand that it was important to tell them the truth?
A. Yeah.
Q. And did you tell them the truth?
A. Yeah.
Q. Ms. Vigil, when was the last time you had any contacted with Allister Quintana?
A. Probably when he got thrown in.
Q. When he got thrown in where?
A. At Andrew's house.
Q. Would -- would that have been on February 8th of 2018?
A. Yeah, I think it was a Thursday or -- yeah, I believe so.
Q. So that day, what were you guy's doing at Andrew's house?
A. Taking shots and they were -- they were playing games, and those guys wanted to have a

cookout and -- yeah, they -- they went down to the store and got the stuff and -- yeah.
Q. And after consuming alcohol, was Allister arrested that day?
A. Yes.
Q. Who else was arrested with Allister on February 8th of 2018?
A. Dominique Haines.
Q. And you haven't had any contact with Allister since February 8th of 2018?
A. No.
Q. Have you spoken with him in any way?
A. No.
Q. So you certainly haven't spoken with him since May 25th of 2018, right?
A. May 25th of this year?
Q. 2018, this year.
A. May 25th? I don't think so, no.
Q. Okay, you haven't had any phone calls with him or anything?
A. No.

[redacted]

BRIAN CACHUCHA,
after having been first duly sworn under oath, was questioned and testified as follows:

EXAMINATION

BY MR. SPINDLE:
Q. Good afternoon, sir.
A. Good afternoon.
Q. Please introduce yourself to the grand jury.
A. I'm Brian Cachucha.
Q. Mr. Cachucha, did you get subpoenaed to be here today?
A. Yes, I did.
Q. And do you understand that you're not the target of this investigation?
A. Yes.
Q. Do you understand that there are currently no claims that you did anything wrong?
A. Yes.
Q. Do you understand that you're currently under oath?
A. Yes.
Q. And do you understand that you must tell the truth?
A. Yes.

25

Q. Do you understand that if you do not tell the truth to the grand jury, you may be charged and convicted of perjury, obstruction of justice, and/or false statements, each of which is punishable by up to five years of imprisonment?

A. Yes.

Q. Do you understand that you may refuse to answer any questions that may incriminate you?

A. Yes.

Q. Mr. Cachucha, how do you know Allister Quintana?

A. He's my nephew. His mother's my -- no, his -- his dad's my first cousin. Yeah.

Q. Okay. How about Travis Howland?

A. He is, like, one of my first cousins -- I mean, nephew -- he's my nephew, too.

Q. Okay.

A. His dad was, like, pretty much my first cousin, too.

Q. Okay. And on January 13th of 2018, did you spend the day with Allister Quintana?

A. Yes, I did.

Q. Were you at his house?

A. Yes, I was.

Q. Is that 66 Navajo Street?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

U.S. v. Allister Quintana

4561

26

A. Yes.

Q. Did you notice any rancid smells or blood in the house that day?

A. No, I didn't.

Q. And did he tell you that day that he planned to kill Travis Howland?

A. He didn't really tell me that he planned, he just mentioned that he was -- well, he mentioned him, and then all he said was, "I'm going to kill him," you know.

Q. And why did he say he wanted to kill Travis Howland?

A. It was to the effect of over a money card that was so much money, I believe it was 30,000 or something on the card, and that was all that it came to.

Q. Did Allister believe that Travis had his money card?

A. Yes.

Q. And that upset him?

A. Yes.

Q. You were arrested and placed in the Dulce jail in January of 2018, right?

A. Yes.

Q. What date was that approximately?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc. PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

U.S. v. Allister Quintana

4562

27

A. Okay, this was -- this was, like, toward the end, like -- it was, like -- it was, like, a week after my birthday on the 13th, it was like about a week after that, and then I -- I spent just a couple of days there, and I ended up getting back in there for the same thing, intoxication. And I just spent a couple of days in there, too, and then they sent me to the detox center after that.

Q. Okay.

A. And that's where I was released from Sunday.

Q. Okay. So let's frame this: You believe it was about January 20th of 2018 when you were taken to jail in Dulce, and then you were released in early February of 2018?

A. I was released before that. I was -- it was somewhere -- somewhere, like, in the middle of January I believe maybe, but I was only out, like, maybe a week, and then I got in trouble again and I got back in; that was around the 25th.

Q. Okay, so you're thinking you were in jail from at least the 25th of January through February 13th?

A. Yes, yes, yes.

Q. Okay. And on February 13th, you were

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

U.S. v. Allister Quintana

4563

28

released from jail, right?

A. Yes.

Q. Was Allister in jail with you from February 9th until your release on February 13th of 2018?

A. Can you run that question again?

Q. Sure. Was Allister in jail with you from February 9th through your release on February 13th?

A. Yes.

Q. Okay. And in jail did he ask you to go by his house once he was released -- once you were released?

A. Not really. I had just stopped by because, you know, I just recently got acquainted with him, you know, because I didn't see him for a long time, and he was mad at me for a long time.

Q. So he didn't ask you to go by his house after you were released?

A. Huh-uh. I was just passing through, and I was passing by and he saw me.

Q. Did he ask you -- between February 9th and February 13th of 2018, did he ask you any suspicious questions?

A. Yeah. The day I was being released, that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

U.S. v. Allister Quintana

4564

29

was, I believe, on the 25th, around the 25th or so. Yeah.

Q. I'm asking you between February 9th and February 13th.

A. Yeah, okay, okay, okay, yeah. Okay. Did he what?

Q. Did he ask you any suspicious questions?

A. To tell you the truth, not really, no.

Q. Was there a time when you were in jail together when he asked you about what prison was like?

A. That was the day I was being released. Like just, I guess, maybe a few minutes before they were releasing me, he -- I guess he saw me go in the restroom by myself, and I was washing up and stuff and getting ready to go, and he came in and asked me that question.

Q. Why did that seem strange to you?

A. It was just like -- I was just, like, I wonder why he asked me that, you know.

Q. And did he clarify why he wanted to know?

A. Huh-uh.

Q. Okay.

A. Once I answered him, he just went out on me.

SANTA FE OFFICE 119 East Marcy, Suite 110 Santa Fe, NM 87501 (505) 989-4949 FAX (505) 843-9492
BEAN & ASSOCIATES, Inc. PROFESSIONAL COURT REPORTING SERVICE
MAIN OFFICE 201 Third NW, Suite 1630 Albuquerque, NM 87102 (505) 843-9494 FAX (505) 843-9492 1-800-669-9492 e-mail: info@litsupport.com
U.S. v. Allister Quintana
4565

30

Q. That was the day you were released?

A. Yes.

Q. So would that have been the 13th of February of 2018?

A. Yes, yes.

Q. Okay. And when you were released, did you spend the evening with a friend of yours named Darwin Valdez?

A. Yes, I did.

Q. Has he since passed away?

A. Yes.

Q. Sorry to hear that.

The next morning, did you have breakfast with Darwin?

A. Yes, I did.

Q. And then did the two of you part ways?

A. Yes.

Q. So that would have been the morning of February 14th of 2018?

A. Yes.

Q. Did you stop by Allister Quintana's house after parting ways with Darwin Valdez?

A. Yes, I did.

Q. Is that the house at 66 Navajo Street?

A. Yes.

SANTA FE OFFICE 119 East Marcy, Suite 110 Santa Fe, NM 87501 (505) 989-4949 FAX (505) 843-9492
BEAN & ASSOCIATES, Inc. PROFESSIONAL COURT REPORTING SERVICE
MAIN OFFICE 201 Third NW, Suite 1630 Albuquerque, NM 87102 (505) 843-9494 FAX (505) 843-9492 1-800-669-9492 e-mail: info@litsupport.com
U.S. v. Allister Quintana
4566

31

Q. Around what time did you get to Allister's house?

A. This was around -- pretty much around early noon hour.

Q. And describe the house when you arrived there.

A. Okay, sometimes I don't take the street. You know, there's a little back trail coming up, from, you know, the back side, and so sometimes when I'm coming from the town, I take that little back way to the house. And I was like maybe -- I would say, maybe 50 feet away when I seen the windows ajar and the light was on, the kitchen light, and I could smell something already.

Q. Will you describe that smell?

A. It smelled like rotten meat.

Q. What did you think it was?

A. To me, it really smelled like -- like when a deer's rotting or something.

Q. And so what did you do?

A. I -- I seen the windows ajar, so thinking somebody was inside like he always was, because sometimes I would approach the window like that when it was open, you know, and say, "Hey, nephew, you know, it's me," you know, and he'll say, "Go to the

SANTA FE OFFICE 119 East Marcy, Suite 110 Santa Fe, NM 87501 (505) 989-4949 FAX (505) 843-9492
BEAN & ASSOCIATES, Inc. PROFESSIONAL COURT REPORTING SERVICE
MAIN OFFICE 201 Third NW, Suite 1630 Albuquerque, NM 87102 (505) 843-9494 FAX (505) 843-9492 1-800-669-9492 e-mail: info@litsupport.com
U.S. v. Allister Quintana
4567

32

door."

But this time there was no answer, and I could smell the odor, so I figured, oh, well, let me go check the door, you know, maybe somebody will answer the door. So I went to the front door; the window was open. So I tried the door because I was yelling through the window still, I was yelling his name. I call him nephew. And I opened the door and I peeked in, and the smell was just bad, and so I was like...

So I went in thinking it was rotten meat in the fridge maybe, and I was, like, you let something rot? How -- you know, I was puzzled because how could -- how could that be, you know. And then so I went to the laundry room, I opened that back door, and that was all cleaned out. And then the kitchen windows, I opened them more. I checked the fridge, everything still looked fresh in there, what little was in there, and I closed that.

I went to the front living room; everything was ajar, like, the couches, everything was out of place. It looked strange. And there was stuff in the living room that was never -- like, just left there and put there, you know. And I was even scared to, like -- first thing that crossed my mind because

SANTA FE OFFICE 119 East Marcy, Suite 110 Santa Fe, NM 87501 (505) 989-4949 FAX (505) 843-9492
BEAN & ASSOCIATES, Inc. PROFESSIONAL COURT REPORTING SERVICE
MAIN OFFICE 201 Third NW, Suite 1630 Albuquerque, NM 87102 (505) 843-9494 FAX (505) 843-9492 1-800-669-9492 e-mail: info@litsupport.com
U.S. v. Allister Quintana
4568

of the smell was don't look in the closet, you know, or that -- one of those back rooms.

So I was like -- I started heading down that hallway toward the back rooms, and there's a first little room, and then there's that first room, you can see it when you're walking down the hall, you can practically see in it when the door's open. And I -- I got to that first little room and then the door to right there, and that -- that room is where all the blood was with a towel in it, like somebody was trying to wipe it up, but they did a sloppy job and just left it. And I just seen the blood puddle with the towel, and everything was already dry.

And that -- that window doesn't -- it's a big window, it doesn't have a curtain on it, and that's where a lot of the light was coming through. The rest of the house, the kitchen, everything was bright because of the curtains, they're white, and so the sun was shining through the kitchen and the dining room pretty bright. And then that back room is the only room that had light where all the blood was.

I didn't go to the back, to the far back or anything, to his room. When I seen the blood, I ran out of the house and I went to my daughter's, like,

two houses up the street, and I told her, let me use your phone, I'm going to report somebody broke into your cousin's house, from what it looks like, and it stinks in there.

And then so I called it in, and Officer Chad told me, CO, he said, well, we're giving out lunch trays right now. And I said, well, I know he's supposed to be released today. He was supposed to get out before me, but apparently he hasn't got released.

Q. Let's back up, Mr. Cachucha, just a moment. So which daughter's house did you go to?

A. My daughter, Cheryl.

Q. Your daughter, Cheryl?

A. Yeah.

Q. And you said you called it in. Did you call the Dulce Department of Corrections?

A. Yes, I did.

Q. Why did you not call 911?

A. This -- well, see, this was the first time, and I said, just let my nephew know that somebody broke into his house. Because I asked him first, did he get released or is he still in there? He said, he's still here. So I said, well, let him know that somebody broke into his house. I didn't want him to

think it was me, because, you know, he started inviting me back over, you know, and then he goes, when you get out, you know, just swing by, you know, so I was, like, okay.

And so anyway, after I called it in to Corrections, they said call back at 2:00, and I was like, well, can you just let him know, you know, because he's supposed to be released today, you know. If he gets released, you know, either way, you know, just let him know. And I'm up in the neighborhood, you know, and then, I'm at my daughter's house. And so he goes, all right, well, just call back at 2:00. And I said, I don't need to talk to you. Just let him know that somebody broke into his house, and there's a smell in there and the house is awry like somebody broke in. And he goes, well, all right, just call back at 2:00 anyway. So I was, like, okay. I ran back up to my -- well, I was at my daughter's already reporting this.

And so we discussed it after we hung up and we were, like, you know -- and that's when she was, like, well, Travis has been missing for -- for a few days now. He would have texted me or, you know, his ex-girlfriend, Alie. And I was, like, really? She goes, yeah. And I said, well, something really

smells in there. They told me to call back at 2:00. And then I said, I don't know if I should go through the house or what. Or what. You know, I'm afraid of what I might find, you know. And so we discussed it. I said, well, I've got stuff to do at my house real quick, I've got to go look through some papers that I need to take back downtown. So I did, and it took me about -- from, like, about 12:30 to about it was exactly a little before 2:00.

So I started headed back down the street where we all live in that whole little area, and I was supposed to go to my daughter's and call because they said they were going to have him on the phone, but since his house is before my daughter's, I figured, well, maybe he got out by now. And as I was going down the driveway and getting -- approaching the door, I seen everything was still the way I left it. I left the back door open, I opened up the kitchen windows wide open, and I just left that front window the way it was, and I left the front door wide open. And so as I was approaching the house the second time, I said, well, maybe he got out. But as I was approaching, I noticed, I said, well, there's still nobody here.

And so I yelled again from the door and I



was like, the smell, you know, and I was like, damn, I wonder if I should go in the back, you know. Maybe somebody's back there. And I was like, should I or shouldn't I? I was scared. And so I said, I'm going to do it, you know, check this out. So I went into his room. There was really nothing from what I could see. I didn't want to look in that big closet in his room. So I was, like, darn. I checked the shower room. I could see from the hallway that the light was off; it looked like nothing was in there. I didn't go in there or turn on the light or anything. I just looked that there was nothing in there. And then I passed the room right there with all the blood in it, and there's this first little room, it's empty.

And so I was going back down the hall, and I was -- something stopped me right there, and I was, like, peek in there. And I was, like, I didn't want to so bad. Either that one or the front door closet, there's a closet right behind the front door. It's a smaller closet and then this one in the hallway is a big closet. And it has a double door, it opens like this way. And I crept the right door open. I didn't open it all the way like that. I was just creeping it open, because it was kind of dark. You know,

there was light on this side and light on this side, but dark everywhere else, you know.

And so the way the light looked shining into it, it looked kind of -- it was gloomy and spooky, and as I was creeping the door open, I crept it -- I got it about that far, and then I noticed it was a person. And I saw from, like, maybe this part on up to the head.

Q. And for the record, are you referring to the waist?

A. Yes. And I couldn't tell who it was or anything. I could just tell the skin was discolored, like, I could tell the body was kind of puffy, and from what I could make out there was, like, wounds all over right here. From what -- I just stared at it for a few seconds, you know.

Q. Are you referring to the torso where those wounds were?

A. Yes, this area right here.

Q. Mr. Cachucha, let me just go back and clarify because the court reporter is writing down everything you say, but we don't have a visual record of this, so just for the court record's benefit, let me make sure that I can adequately express what you showed with your hands while you were testifying.

A. Okay.

Q. Tell me if this is correct.

A. Okay.

Q. When you said you were opening the doors, there were two doors in the hallway?

A. Yes.

Q. And both of those doors open inward --

A. No --

Q. -- towards you?

A. -- they open outward.

Q. Okay, towards you?

A. Yeah.

Q. Towards you.

A. Yeah.

Q. And you open one of them outward towards you?

A. Yeah.

Q. And about a foot wide?

A. Yeah.

Q. And you peeked in, and you could see --

A. As I was --

Q. -- someone's body?

A. Yeah, as I was -- I was creeping it open like that, I was starting to see it more and more and more, and then I got so far and I was, holy moly,

that's a person. And I couldn't tell who it was.

Q. You mentioned it was discolored?

A. Yeah.

Q. What color was it?

A. It kind of looked pale, but then again it looked like -- you know, like, red, yellow, green, whatever, from what I saw.

Q. Did you have any idea whose body it was?

A. No, I did not.

Q. So what did you do at that point?

A. I ran back up to my daughter's and I reported it. Her family was -- her family was there, her mom, her mother's sister and the little kids, they were all there. They were just sitting in the living room watching TV or whatever. And when I ran back up there, I said, hey, let me use your phone, one of your phones. There's somebody dead in your cousin's house. And they just freaked out. They didn't believe me. I said, let me use your phone.

And then everybody kind of panicked, mainly like my sister-in-law. Well, I -- she's still my sister-in-law even though we were never married, but we were that close. And so she was, like, do you really think you should call? I said, yes, I am going to call this in. You know, this is crazy. I'm



not going to let this go, you know. There's a person in that -- in the closet, and you can smell it, it smells pretty strong. I said, I'm surprised you can't smell it from here, because she's just like maybe -- maybe not even 100 feet away.

And so right away my ex-girlfriend handed me her phone and then I called it in. And, like, five minutes later I was already talking to the police, and the investigation, and everything.

Q. And did you report it that time, again, to the Department of Corrections?

A. Yes, I called Corrections again, but I said, let my nephew know that there's somebody dead in his house. Because I asked, did he get out yet? And they said, no, not yet. I said, well, let him know this, I said, there's somebody dead in his house, so get the cops up here, the emergency. So that was -- that was...

Q. And was the person you talked to at the Department of Corrections that time Wendy, your niece?

A. Yes.

Q. And she obviously must have reported it because law enforcement showed up to the house?

A. Yes. She's a CO.

Q. Okay.

A. Yeah.

Q. And, again, you didn't call 911 because you thought reporting it to the Department of Corrections was sufficiently reporting it?

A. Yeah, I figured, yeah, everything goes together, you know, it's going to get reported anyway through -- all the way, so I figured it wouldn't matter, you know, just -- just call, you know.

Q. Sure. After the -- after law enforcement came by the house on Navajo, did you go by Bennie Collins' house?

A. Yes, I did, later on that day.

Q. And did you speak with Bennie and Bennie's father about the fact that you discovered the body in --

A. Yes.

Q. -- in Allister's house?

A. Yes, I did.

Q. Okay. Now, Mr. Cachucha, you had nothing to do with the death of Travis Howland, did you?

A. No, I didn't.

Q. In fact, you were in jail from January 25th, approximately, through February 13th?

A. Yeah, yeah.

Q. And did you speak with FBI Agent Lance Roundy on June 25th of 2018?

A. Yes, I did.

Q. And did you understand how important it was to tell the truth --

A. Yes.

Q. -- the truth to Agent Roundy?

A. Yes.

Q. Okay. And you did tell him the truth?

A. Yes, I did.

Q. When was the last time you had contact with Allister Quintana?

A. That last day I got out that was on the 13th.

Q. February 13th?

A. Yeah.

Q. You haven't spoken with him in any way, on the telephone or anything, since then?

A. No.

Q. Since February 13, 2018?

A. When I got put back in that second time, I said -- I told officers, is my nephew still here? They said, yeah. And I said, well, where do you guys have him? They said, he's back in the population. I

said, I don't want to go back in there, I don't even want to see him or talk to him. So they put me in a different cell, and eventually I got out, like a couple of days later.

Q. Okay. So no conversations whatsoever with him since February 13th of 2018?

A. No.

Q. Okay.

BENNIE COLLINS, II,

after having been first duly sworn under oath, was questioned and testified as follows:

EXAMINATION

BY MR. SPINDLE:

Q. Would you please introduce yourself to the Grand Jury.

A. My name's Bennie Collins, II.

Q. And, Mr. Collins, you testified here about a month ago, right?

A. Yeah, on my birthday.





Q. Okay. And did you again get subpoena to be here today?

A. Yeah.

Q. And, again, did you -- do you understand that you're not the target of this investigation?

A. Yes, sir.

Q. You understand that there are currently no claims that you did anything wrong?

A. Yes, sir.

Q. And do you understand that you are currently under oath?

A. Yeah.

Q. And do you understand you must tell the truth?

A. Yes, sir.

Q. Do you understand that if you do not tell the truth to the Grand Jury, you may be charged and convicted of perjury, obstruction of justice and/or false statements, each of which is punishable by up to five years imprisonment?

A. Yes, sir.

Q. And do you understand that you may refuse to answer any question that would incriminate you?

A. Yeah.

Q. Okay. Mr. Collins, the first question I

want to ask you about is during your previous testimony you talked about seeing a photograph when Warren Cachucha picked you up sometime February 3rd of 2018 --

A. Yeah --

Q. -- do you remember that?

A. -- Harley and Warren picked me up, and that's when they showed me the picture.

Q. They showed you a photograph of Travis Howland?

A. Yeah.

Q. And I'm going to show you what has been marked as Grand Jury Exhibit 1. Sir, does that -- that image appear familiar to you?

A. Yeah, that's the picture.

Q. That's the picture --

A. Yeah.

Q. -- they showed you? And does it appear to be a true and accurate depiction of what you were shown the day Warren and Harley picked you up?

A. Yeah, he showed me it on his phone.

Q. Okay.

MR. SPINDLE: And I'm going to publish this to the Grand Jury, I'm going to pass it around. Actually, I'll start right here.

Q. And the person that's depicted in that photograph, is that Travis Howland?

A. Yeah.

Q. Okay.

A. Yes, sir.

[REDACTED]

[REDACTED]: So we were confused about two things. You had told Harley that your car was at Allister's house that morning.

WITNESS COLLINS: No, it was the day I bailed Allister out of jail. The day he kicked her out was the day I was there in my -- with my car. I pulled off to the side like this by a tree.

[REDACTED]: And you left your car there?

WITNESS COLLINS: No. I use my car every -- it's a truck, actually. I use my truck every day. It's a Ford F-150.

[REDACTED]: Then why did you call Harley

to take you to the FBI or to go talk?

WITNESS COLLINS: Because they started threatening me, calling me on the phone and everything.

[REDACTED]: Who?

WITNESS COLLINS: Harley and Warren. They told me that -- I don't know, they just called me, started telling me just, I don't know, that I was a part of it, and I told them I wasn't. So I told them, can you please take me to the immediate authorities so I could talk to them. And that's what I did.

[REDACTED]: Was that to ensure that they knew that you were cooperating in the investigation?

WITNESS COLLINS: Yeah, I did everything. Anything anyone wanted.

[REDACTED]: Did you want them to understand that by dropping you off there, they knew that you were cooperating and doing everything you could do?

WITNESS COLLINS: Yeah, I went up there and I seen them, and then they told me to go down to the PD and see them at 6:00, so that's what I did. And that's when I did my first interview.

[REDACTED]

[redacted]
[redacted] I don't know if you'll exactly remember, but we were just trying to get, you bailed Allister out, was it, January 31st or the 1st of February?
WITNESS COLLINS: It had to be the -- the night before -- I think it was his birthday or the night before his birthday I got him out of jail, because I had to scrounge my things together, I pawned them, and I got the money together and I got him out.
[redacted] Okay.
WITNESS COLLINS: That was the night me and Cheryl were there.
[redacted] And then that's the same evening that Allister kicks Harley and Michael out of the house?
WITNESS COLLINS: Yeah.
[redacted] Okay.
WITNESS COLLINS: And that's the same evening my girlfriend wanted me to go back home.
[redacted] Okay.
MR. SPINDLE: And so to be clear, Allister was out of custody by February 1st of 2018, right?
WITNESS COLLINS: Yeah, he was at his

house, yeah.
[redacted] When did you see this picture?
WITNESS COLLINS: The day they picked me up, the day they were calling me on the phone.
[redacted] February --
WITNESS COLLINS: That's when Warren showed me. I can't remember the exact date, but it was the date I did my interview.
Q. (By Mr. Spindle) It would have been the date that the body was discovered in Allister's house, correct?
A. It should have been, yeah.
Q. So then that would have been February 14th of 2018?
A. Yeah, the date I did my first interview is when I first seen it.
Q. When you say your first interview, you mean your first interview with law enforcement --
A. Yeah --
Q. -- after discovering --
A. -- it was that evening.
Q. Okay. And let me finish the question.
-- after discovering that Travis Howland's body had been discovered in Allister's house, right?

A. Yeah.
[redacted] So what's this picture of? I'm sorry, I don't remember this.
Q. Mr. Collins, would you describe the image that's marked as Grand Jury Exhibit 1.
A. I guess it's just Travis with a fifth, a bottle by him.
Q. And you weren't there when that photograph --
A. No.
Q. -- was taken, right?
A. No, sir.
Q. It's just specifically the photograph that was shown to you --
A. Yeah.
Q. -- when you were taken to the FBI for your first interview?
A. When -- when they picked me up, that's when Warren showed me.
[redacted] Was that after -- I think you mentioned he got beat up somewhere along the line --
WITNESS COLLINS: Yeah.
GRAND JUROR: -- or somebody did. Is that

after -- do you think that this picture was after that beating or was this after his death?
Q. (By Mr. Spindle) And, sir, do you know when that image was taken?
A. I don't. I don't.
Q. But that is specifically the image that was shown to you on February 14th --
A. Yes.
Q. -- of 2018?
A. Yes, sir. That's what Warren showed me on his phone.
Q. Thank you.
[redacted]
WITNESS COLLINS: You guys -- you guys are a lot of people. It's a lot of people.
[redacted]

[redacted]

[redacted]

Q. (By Mr. Spindle) Mr. Collins, you understand you're still under oath?

A. Yes, sir.

Q. To clear up a couple of things, when you were picked up on February 14th of 2018 and taken to the FBI office, were you picked up by Warren Cachucha and Harley Howland?

A. And Michael.

Q. And Michael.

A. Yeah.

Q. That's Harley Howland's boyfriend?

A. Yeah.

Q. Is his last name Davis?

A. I don't know his last name, but that's her boyfriend.

Q. Those are the three people that picked you up?

A. Yeah.

Q. Who is Warren Cachucha in relation to you?

A. Just a friend.

Q. Okay.

A. He's just my friend.

Q. Is he related in some way to Mr. Howland?

A. I don't think so. I know Harley is, but I don't think -- I don't think he is.

Q. So is Warren just a concerned friend of the family?

A. Yeah, he was concerned, threatening me over the phone and stuff, like, you know, so I just told him to take me straight to them.

Q. Okay.

A. That's what I did.

Q. So who called who first on February 14th of 2018? Did you call Harley or did she call you?

A. Warren called me.

Q. Warren called you.

A. Yeah.

Q. And in response to that, how did -- what did you do?

A. I just told him -- well, I told him to tell Harley to come to my house right away, and they were both at work, I guess. They work at the EMS. So they said when they get time, they'll come. And I waited for them, they came. It was her boyfriend, Harley and Herman -- or Warren. They picked me up, and that's when I told them everything, and I told them if you could take me up there, please.

Q. Sure.

A. Because -- because they told me, yeah, you better not be driving your truck around, your truck's wanted, you're -- you can't be seen by the cops or whatever. And I said, you know what, I don't want to be like that, you know. I want to go speak to them right away myself.

Q. And so just to be clear on the chain of events, on February 14th of 2018, did Brian Cachucha stop by your house before you received the phone call from Warren?

A. Yeah.

Q. So Brian Cachucha stopped by your house; you had a conversation with him about what he discovered at Allister's house?

A. Yeah.

Q. Shortly thereafter, Warren called you?

A. Yeah.

Q. And when Warren called you, he threatened you?

A. He just -- it wasn't really a threat, like threatening, but it was just, like, demanding.

Q. Demanding to know --

A. Yeah.

Q. -- what happened?

A. Yeah, demanding to know.
Q. And why would he have thought that you would know anything about it?
A. I don't even know. Just -- just because they -- they said that -- well, he said over the phone, they said that my truck was seen over there, whatever, and, yeah, that's why I wanted to go talk to the FBI right away.
Q. And was Allister a good friend of yours at that time?
A. Yeah.
Q. Okay. And so after speaking with Warren on the phone, you made arrangements for he and -- and Harley to pick you up sometime when they had an opportunity?
A. Yeah, it was in the evening, probably around 6:00, 6:30 -- no, like, maybe, like, 4:30, 5:30, because I spoke to them down there at 6:00.
Q. Okay. And then Warren, Harley and Michael picked you up in a vehicle?
A. Yeah.
Q. They showed you the photograph that's marked as Grand Jury Exhibit 1?
A. Yeah.
Q. You don't know when that photograph was

taken?
A. Hum-um.
Q. And they gave you a ride to speak with law enforcement?
A. Yeah.
Q. And where was that at?
A. The crime scene. They took me up there. That was the only place I knew where the FBI was, and that's where they said they were, so... I spoke to the tribal police first, and then they wanted me to write an affidavit, so I -- I tried to write one, but that guy just came out of the -- the house and told me not to write one, and to meet them down there at 6:00.
Q. Okay.
A. So that's what I did. Took my truck down there, I gave them my imprints on my shoes and stuff, and the tire tracks and everything.
Q. And that was there at the Jicarilla Police Department?
A. Yeah. And they took pictures of everything, my truck and everything.
[redacted] The picture that you saw from

Warren was on his phone?
WITNESS COLLINS: Yeah, they showed me from his phone, yeah.
[redacted] Okay.
[redacted] How did Warren get a picture of Travis?
Q. (By Mr. Spindle) Do you know how Warren obtained this photograph? Did he say anything about it?
A. I don't know. It was posted on Facebook, supposedly. Something like that.
Q. And do you know who posted it?
A. Huh-uh.
[redacted]
[redacted] Was he dead at that time?
WITNESS COLLINS: I wouldn't know. I was at home with my girlfriend.
Q. (By Mr. Spindle) Do you know any of the circumstances surrounding the taking of this photograph?
A. Hum-um.
[redacted]

WITNESS COLLINS: Thank you guys again, too.
[redacted]



REPORTER'S CERTIFICATE

I, Peggy Jo Gonzales, New Mexico Certified Shorthand of the above-entitled cause were reported by me stenographically on July 10, 2018, and that the within transcript is a true and accurate transcription of my shorthand notes.

I FURTHER CERTIFY that I am neither employed by nor related to any of the parties or attorneys in this case, and that I have no interest whatsoever in the final disposition of this case in any court.

Peggy Jo Gonzales
BEAN & ASSOCIATES, INC.
NM Certified Court Reporter #145
License expires: 12/31/18

(757N-PJ)
Date taken: July 10 2018